**George TAYLOR, Appellant,**

v.

**STATE of Texas, Appellee.**

**No. 13–81–258–CR.**

Court of Appeals of Texas, Corpus Christi.

April 28, 1983.

Rehearing Denied May 26, 1983.

Discretionary Review Refused Sept. 28, 1983.

Richard Haynes and Jan Woodward Fox, Haynes & Fullenweider, Houston, Larry J. Adams, Giles & Adams, Corpus Christi, for appellant.

Grant Jones, Dist. Atty., Corpus Christi, for appellee.

Before NYE, C.J., and BISSETT, YOUNG, KENNEDY and GONZALEZ, JJ., Sitting En Banc.

## OPINION

BISSETT, Justice.

This is an appeal by George Taylor from a conviction for the offense of aggravated assault under Tex.Penal Code Ann. § 22.-02(a)(1) (Supp.1982). The jury assessed punishment at ten years' imprisonment and a fine of $5,000.00, but recommended probation. Judgment was rendered on the verdict in accordance with the jury's recommendation. We reverse the judgment of the trial court.

The conviction is based solely on circumstantial evidence. The trial court charged the jury on circumstantial evidence, and in pertinent part, instructed the jury that if they believed beyond a reasonable doubt that on May 15, 1980,

"... the defendant, George Taylor, acting with the intent to promote the commission of the offense of aggravated assault against Michael Brink, did then and there, solicit, encourage or direct Benjamin Boyd Smith to solicit, or encourage, or direct Kenneth Wolters to commit the offense of aggravated assault against Michael Brink, then you will find the defendant guilty of aggravated assault.

Unless you so find from the evidence beyond a reasonable doubt, or if you have

a reasonable doubt thereof, you will acquit the Defendant of aggravated assault."

Appellant, in his first ground of error, challenges the sufficiency of the evidence to connect him with the commission of the offense with which he was charged. Since we sustain that ground, it is not necessary that we consider the remaining grounds of error.

It is conclusively shown that appellant did not personally assault Brink. It is undisputed that Kenneth Wolters and Harold Lee assaulted Michael Brink in an office building in downtown Corpus Christi, Texas, shortly after 1:30 p.m. on May 15, 1980. It is also undisputed that Benjamin Boyd Smith engaged Wolters and Lee to assault Brink, and that Smith drove them from San Antonio, Texas, to Corpus Christi on the morning of May 15, 1980, and arrived in Corpus Christi at about 11:00 a.m. Wolters, who was granted immunity from prosecution, testified for the State. Neither appellant, Lee nor Smith testified.

The record reflects that, in October, 1975, Jeanne Goodhew went to work for appellant as his personal secretary. At that time, and at all times pertinent to this appeal, appellant maintained an office at Taylor Brothers Jewelry Store in Corpus Christi, Texas, and owned a condominium in the Las Brizas Condominium, in Corpus Christi. Appellant also owned and operated several sporting goods stores; he was active in "softball" and in "fast pitch" baseball. Appellant and Goodhew had a "romantic involvement" from the first part of 1976 until sometime in March, 1978, when Goodhew left appellant's employ. She was employed as a secretary for the law firm of Meredith, Donnell and Edmonds, in Corpus Christi at the time Brink was assaulted.

Goodhew met Brink in February, 1978. They began to see each other almost daily and became "romantically involved." One evening in March, 1978, Brink appeared at Goodhew's house. Upon arrival, he found appellant, a man whom Brink had never seen before, emerging from Goodhew's bedroom. Each ordered the other to leave;

neither did so. Brink then attacked appellant, "hit him one good punch in the eye," and chased him out of the house. No charges were filed against either man. The fight took place "in the bathroom and the hallway" of the house. Appellant, shortly after the incident, told Goodhew that "if he [(Taylor)] had had his bat, he [(Brink)] wouldn't have been able to do this to him."

On the next Monday after the fight, Brink phoned appellant, primarily for the purpose of asking him not to fire Goodhew. Brink testified that appellant, during this conversation, threatened to send "some guys to get me." Goodhew testified that about two weeks after she left her employment with appellant, she was told by appellant that he would not harm Brink if she returned to his employ, but if she refused he would wait a "couple" of years and then "he'd take care of him [(Brink)]." Goodhew refused.

Approximately one month after the confrontation between appellant and Brink, appellant sent Goodhew a framed picture of an oak tree. She showed it to Brink who folded the picture (which for all practical purposes destroyed it) and mailed it along with a letter to appellant. Shortly thereafter, Brink received a rather sarcastic letter, signed "D," which enclosed a nude photograph of Goodhew. Goodhew testified that appellant was the only person who had ever taken photographs of her in the nude. The person who wrote the letter to Brink was never identified.

There is no evidence of any further contacts between Brink and appellant. Over two (2) years later, on May 15, 1980, Brink, who was then employed as a special investigator for the law firm of Meredith, Donnell & Edmonds in Corpus Christi, was in his office shortly before 1:30 p.m., discussing a case with an attorney in the firm. Brink received a phone call relating to some people coming to see him, and the attorney departed. Brink then instructed the receptionist to show his expected visitors to his office upon their arrival. Shortly afterwards, two men, who were unknown to Brink, entered his office. One man (later

identified as Wolters) was about 6–4, and weighed about 220, while the other (later identified as Lee) was smaller, about 5–10 or 5–11, and weighed about 180. The larger of the two proceeded to swing a baseball bat at Brink's head. This man (Wolters) repeatedly swung at Brink's head with the bat, without success, instead striking Brink on the arm, ribs and back. Brink received five or six solid blows. He was not hospitalized and was able to return to work the next day despite pain and bruises. Lee did not strike Brink with a baseball bat. The bat which Wolters used was recovered in the library of the law firm and another bat, similar to the one in the possession of Lee, was recovered near the place where Wolters and Lee were apprehended and handcuffed by a security guard in the building where the assault occurred. Both bats were introduced in evidence.

Appellant sponsored softball teams which competed at the city, state and national levels. Some of his sporting goods stores carried baseball bats in their inventory which were similar to those admitted in evidence.

Richard Pannell, a friend of appellant for 20 years, stated that he heard about an incident where two men allegedly entered a Corpus Christi office building and assaulted a man by the name of Brink. He knew nothing about the incident personally and further stated that his only knowledge was "just hearsay," from what other people told him. He had a conversation with appellant on the afternoon of June 2, 1980. The following questions by the prosecutor and Pannell's answers thereto relate to that conversation:

"Q  Did you (sic) tell the jury as best you can recall exactly what words he used, or what words he used?

A  Well, he said he had screwed up; that he was in trouble."

\*    \*    \*    \*    \*    \*

"Q  . . . What else did he say in reference to his declaration to you that he was in trouble?

A  He said that he was in over his head and that he may wind up having to take his medicine.

Q  What else did he say?

A  He said he had lied to his attorney, but he had not lied to a grand jury.

Q  Okay.

A  And—

Q  Okay, in this regard, did he make any statements to you concerning what he was making reference to?

A  He said in the context of the conversation about this baseball bat deal."

\*    \*    \*    \*    \*    \*

"Q  Now, in the course of your conversation, did Mr. Taylor make any reference to the nature of the parties involved in that incident?

A  He said there were some rough people involved.

Q  Did he give any names?

A  No, sir."

\*    \*    \*    \*    \*    \*

Wolters related that he and Lee first met Smith, at some undetermined time, in the San Antonio law offices of Allen Brown. Approximately one week later they met with Smith again and planned an attack on a man, who, at that time was unknown to Wolters. The extent to which the man was to be hurt was left up to Wolters and Lee. Wolters did not know Brink and had never seen him until he entered Brink's office. Wolters said that he did not intend to hurt Brink, just to scare him. Wolters was not told for whom, if anyone, Smith was working in connection with the assault on Brink.

While on the way from San Antonio to Corpus Christi, Smith "pulled out a list," and Smith and Lee had a conversation, which was overheard by Wolters. According to Wolters, the "list" contained Brink's name, his place of employment, his home address, where he parked his car, places where he "frequented," and "pertinent information as far as locating the man." During the drive, Smith, who had baseball bats in the vehicle, offered the use of the bats to the two of them and of a revolver to

Lee, to be used by them in the proposed assault. The offer of the revolver was refused.

Wolters further testified, that, after arriving in Corpus Christi, Smith, Wolters and Lee "ate in a cafe at the ground level," near the Petroleum Building. After lunch, the three walked around in the area in an attempt to locate an automobile which was registered to Brink. They were unsuccessful. They then went to Brink's house, but Brink was not there. Then, the trio proceeded back to the downtown area, and Smith made a phone call and found out where Brink was employed; Smith called the employer "and verified that he (Brink) was working there." After the phone call, Smith, Wolters and Lee drove around the building where Brink worked. Wolters and Lee got out of the vehicle, went into the building, and assaulted Brink. Wolters and Lee were taken into custody a few minutes after 1:30 p.m. on May 15, 1980.

Wolters was shown a picture which had been marked State's Exhibit No. 8. He identified the person shown in the picture as Smith. He testified that it was the same person that he "came to Corpus Christi with on May 15th to commit an assault on Michael Brink."

Sgt. Guadalupe Garza, a detective with the Corpus Christi Police Department, testified that on June 12, 1980, he booked a man by the name of Boyd Smith into jail. He stated that Smith "had been arrested for some grand jury indictments [that] had been returned." He (Garza) searched Smith at that time and found a telephone credit card in his wallet which had been issued to Murna Stout, 2503 Jackson Keller, Apartment 216, San Antonio, Texas. He made a photographic copy of the card, which, over appellant's objection, was introduced into evidence. The original was placed back in Smith's wallet.

Goodhew related that during her employment as appellant's secretary, on several occasions, she had spoken with an individual named Jeff Morehouse by telephone, as a result of Morehouse calling appellant and ordering jewelry. She was unaware of any

other business dealings between Morehouse and appellant. She explained that her office adjoined appellant's and that they shared four common telephone lines accessible from either his office or her own. There was an additional line into appellant's private office to which she did not have access.

Judy Houck, who went to work for appellant in April, 1978, and was working for him as his secretary on May 15, 1980, testified that she knew a person named Jeff Morehouse. She said that appellant and Jeff Morehouse were friends, and telephoned each other "on numerous occasions." She did not personally know of any business dealings between them, except there was "something that they were going into in San Antonio, and that's all." She recalled that about the time she first heard about the attack on a man in the Bank & Trust Building, she received a phone call at her office in Taylor Brothers Jewelry Store from a person who told her that he needed "the key" to appellant's condominium. She said that the man said that his last name was "Smith." Appellant was not in his office. Houck called appellant's house, and "talked to Mrs. Taylor." She made no further efforts to locate appellant. She could not remember the exact date of the telephone call, but she did say that it occurred about 4:00 o'clock in the afternoon of the day when she "was told" that appellant took "his kids" to a gymnastics class.

Nikki Yaeger, owner of Gymnastica, verified from her attendance records that appellant's daughter was present for gymnastics class on May 15, 1980, between 4:30 and 5:30 p.m.

The State introduced certain records from Southwestern Bell Telephone Company to show that the following long distance phone calls between Corpus Christi and San Antonio were made on May 15, 1980:

1. 8:48 a.m.—from a Jeff Morehouse telephone at 458 N.W.W. White, in San Antonio to Taylor Brothers Jewelry Store in Corpus Christi (3 minutes);

2. 1:52 p.m.—from Taylor Brothers Jewelry Store in Corpus Christi to a Jeff Morehouse telephone at 458 N.W.W. White, in San Antonio (1 minute);

3. 2:49 p.m.—from a pay phone at Wilson's Sandwich Shop in Corpus Christi to Murna Stout's residence in San Antonio—collect (5 minutes);

4. 3:13 p.m.—from a pay phone at Las Brizas Condominium in Corpus Christi to Murna Stout's residence in San Antonio—collect (1 minute);

5. 3:18 p.m.—from a pay phone at Las Brizas Condominium in Corpus Christi to a telephone listed in the name of Steve Brown, 222 Main Plaza, in San Antonio, which was charged on a credit card issued to Murna Stout (2 minutes);

6. 3:33 p.m.—from a pay phone at Las Brizas Condominium in Corpus Christi to a Jeff Morehouse telephone at 201 Morningside Dr., in San Antonio, which was charged on a credit card issued to Murna Stout (2 minutes);

7. 3:38 p.m.—from a Jeff Morehouse telephone at 201 Morningside Dr., in San Antonio to Taylor Brothers Jewelry Store in Corpus Christi (1 minute);

8. 3:39 p.m.—from a Jeff Morehouse telephone at 201 Morningside Dr., in San Antonio to a pay phone at Las Brizas Condominium in Corpus Christi (2 minutes);

9. 4:36 p.m.—from a Jeff Morehouse telephone at 201 Morningside Dr., in San Antonio to S.G. Taylor's residence in Corpus Christi (1 minute);

10. 5:27 p.m.—from a pay phone at Frank's Spaghetti House in Corpus Christi to a telephone listed in the name of Steve Brown, 3707 Big Meadows, San Antonio, which was charged on a credit card issued to Murna Stout (5 minutes).

Mary Badger, who, along with her husband, manages the Las Brizas Condominium, testified that about the middle of May, 1980, a man came to Las Brizas and asked her for a key to appellant's condominium. She refused the request, but gave him the phone number of appellant's office. She testified that the man proceeded to make telephone calls from either her counter phone or from a pay phone in the lobby. He stayed about twenty minutes, "give or take five." State's Exhibit No. 8 was shown to her. She said that the Exhibit was a picture of the man who sought the key to appellant's condominium. She did not remember the exact day in May when the man contacted her and made the telephone calls. She did not see appellant on that day.

Two individuals named Bobby Stout and Murna Stout were, at one time, tenants in apartment 216, Bluff Apartments, 2503 Jackson-Keller Road, San Antonio, Texas. Ruth Spector, a former manager of the Bluff Apartments, identified State's Exhibit No. 8 as a picture of Bobby Stout. She testified that Bobby Stout and Murna Stout were husband and wife. She said that they resided in apartment 216 for at least 18 months, and were still living in that apartment when she (Spector) terminated her position as Manager of the Bluff Apartments in July, 1980. According to Spector, Bobby Stout received mail at the apartment under various names, including that of Smith.

Wolters, in addition to his testimony which has already been detailed, also testified as to certain statements made to him by Smith on the way from San Antonio to Corpus Christi. Such statements were challenged by appellant on the ground that they were hearsay, but the objections were overruled by the trial court when the prosecutor advised the court:

"Your Honor, that goes to the order of my proof. The whole focus of this trial is connecting Mr. Taylor with Mr. Smith, and before the trial is over, we will connect Mr. Taylor and Mr. Smith, making them all co-conspirators, and this testimony comes in under the co-conspirator tes-

timony under the hearsay rule, and we offer it at this time."

The statement of facts sets out the following questions propounded to Wolters and his answers thereto:

"Q On the way to Corpus, did Mr. Smith tell you about why this man was to be beat up?

A Yes, he did.

Q What did he tell you?

A It was in relation to a woman that was being seen by him and another man.

Q You say by him. Who is him?

A Mr. Brink.

Q Okay.

A And that they had both been seeing, and that Mr. Brink had beaten up and humiliated this other man.

Q Did he name the other man?

A No, sir, he did not.

Q Did he say what had been done to the little man?

A Yes, sir, he did. Vaguely, I remember in the conversation that the man had been beaten up and his head had been stuck in a toilet."

\* \* \* \* \* \*

"Q On the way down from San Antonio, when Mr. Smith was telling you why you were coming down to do what you were going to do, did he describe this woman that was involved in any greater detail?

A In so much as that in the conversation he described that the woman was employed in Mr. Brink's office; that she was a secretary in some capacity.

Q On May 15th?

A Yes, sir. Whether she was employed at the law office May 15th, I'm not—I don't know that fact, but at one point in time she was employed as a secretary in those offices."

\* \* \* \* \* \*

"Q ... Did Mr. Smith discuss the motive for coming down to Corpus, if you can recall?

A At that time he led me to believe that—

MR. HOUSE: WELL,—

Q (By Mr. Jones) What did he say?

A He said that it was an amount of money that was owed and that it couldn't be collected and therefore the man was going to be beat up."

■ In reviewing a circumstantial evidence conviction, we review the evidence in light of the presumption that the accused is innocent, and we will not presume any acts against him that are not shown to have been committed by him. *Carlsen v. State,* 654 S.W.2d 444 (Tex.Cr.App.1983); *Culmore v. State,* 447 S.W.2d 915 (Tex.Cr.App.1969).

■ This case calls for application of the rules of law relating to circumstantial evidence. Those rules are set out in *Thomas v. State,* 150 Tex.Cr.R. 540, 203 S.W.2d 536, 538 (Tex.Cr.App.1947), as follows:

"In order to warrant a conviction on circumstantial evidence each fact necessary to the conclusion sought to be established must be proved by competent evidence beyond a reasonable doubt; all the facts must be consistent with each other and with the main fact sought to be proved; and the circumstances, taken together, must be of a conclusive nature, leading, on the whole, to a satisfactory conclusion, and producing in effect a reasonable and moral certainty that the accused, and no other person, committed the offense charged. It is not sufficient that the circumstances coincide with, account for, and therefore render probable the guilt of the defendant; they must exclude every other hypothesis except that of defendant's guilt, and unless they do so beyond a reasonable doubt, the evidence is not sufficient to warrant a conviction."

See, also, *Flores v. State,* 551 S.W.2d 364 (Tex.Cr.App.1977).

Every circumstantial evidence case must necessarily be tested by its own facts to determine whether the evidence is sufficient to support the conviction. *Swink v. State,* 617 S.W.2d 203 (Tex.Cr.App.1981), cert. den., 454 U.S. 1087, 102 S.Ct. 648, 70 L.Ed.2d 624; *Dixon v. State,* 541 S.W.2d 437 (Tex.Cr.App.1976).

In deciding whether the evidence is sufficient to sustain the conviction, an appellate court has a duty of insuring that no one is convicted of a crime except on proof beyond a reasonable doubt, and in a circumstantial evidence case, upon proof excluding all the reasonable hypotheses except the defendant's guilt. *Bryant v. State,* 574 S.W.2d 109 (Tex.Cr.App.1978); *Easley v. State,* 529 S.W.2d 522 (Tex.Cr.App.1975); *Higgins v. State,* 515 S.W.2d 268 (Tex.Cr. App.1974).

To warrant a conviction on circumstantial evidence, there must be proof to a degree of certainty greater than probability or a strong suspicion tending to establish that the defendant was the person who committed the crime, or was a participant therein; there must be direct evidence which establishes the basic facts beyond a reasonable doubt. However, the rules relating to circumstantial evidence do not require that every fact point independently and directly to the defendant, nor do the rules demand that the circumstances should to a moral certainty actually exclude every hypothesis that the act may have been committed by another person, but the hypothesis intended is a reasonable one consistent with the facts proved and permissible inferences drawn from such facts. It is enough if the conclusion of guilt is warranted by the combined and cumulative force of all incriminating circumstances. *Jones v. State,* 442 S.W.2d 698 (Tex.Cr.App.1969), cert. den., 397 U.S. 958, 90 S.Ct. 967, 25 L.Ed.2d 143.

In determining whether appellant bears criminal responsibility for the assault on Brink, we look to events which occurred before, during and after the assault. The test of whether appellant bore criminal responsibility for the assault was whether circumstances sufficiently established that appellant, acting with intent to promote the assault, committed any act or acts which aided Wolters and Lee in their actual commission of the assault. As stated by the prosecutor in the trial, "[t]he whole focus of this trial is connecting Mr. Taylor with Mr. Smith."

The issue to be determined is whether the State established such independent facts and circumstances which link appellant with the commission of the assault on Brink. Specifically, does the evidence, when considered in its totality, connect appellant, beyond a reasonable doubt, with Smith in the commission of the attack on Brink? We answer that question in the negative.

It must be remembered that neither Lee, Smith, Morehouse, Steve Brown nor Murna Stout testified. Therefore, we are mindful of the rule announced in *Schershel v. State,* 575 S.W.2d 548, 551 (Tex.Cr.App.1979), as follows:

> "Where circumstantial evidence relied on by the prosecution is obviously weak and where the record on appeal shows not only that other testimony which would have cast additional light on the facts was available to the prosecution, but also that the prosecution did not introduce such other evidence or satisfactorily account for its failure to do so, the appellate court will treat the case as one showing reasonable doubt of the sufficiency of the evidence to support the conviction."

See, also, *Ysasaga v. State,* 444 S.W.2d 305 (Tex.Cr.App.1969); *Carlsen v. State,* supra. In the instant case, appellant requested that he be permitted to call "Counsel for the State" as a witness "for the purpose of showing that neither Jeff Morehouse nor Alan Brown nor Steven Brown had been indicted in this matter." The State resisted and argued to the court, outside the presence of the jury, that "the disposition of criminal prosecutions against co-conspirators is not relevant," and "if we go into that, we're going to have to put on evidence that Harold Lee pled guilty and has gone to the penitentiary for five years and that

Benjamin Boyd Smith is under indictment, and also I would be entitled to go into the explanation of why those people have not been indicted." The request was refused, to which appellant objected.

■ We now review and analyze the several sets of circumstances which, when considered as a whole, according to the State's argument, established circumstantially appellant's culpability. In doing so, we assume, arguendo, that the statements made by Smith to Wolters were admissible.

The romantic involvements between Goodhew and appellant, Goodhew and Brink, the spurning by Goodhew of appellant in favor of Brink, the fight between Brink and appellant, and the subsequent threats made by appellant form a legally sound basis for an inference that appellant personally desired that physical harm befall Brink at some future date. However, all that is established by those facts is motive.

The letter, signed "D," which enclosed the nude photograph of Goodhew, at best raises an inference that appellant was the actual sender. They, along with the evidence that appellant was the only person who ever took nude photographs of Goodhew, do not tend to connect appellant with the commission of the offense charged. The only legitimate inferences that can be drawn from that evidence is that the sender of the letter wanted Brink to know that the then object of his affections had theretofore permitted nude photographs to be taken of her.

Concerning the use of baseball bats in the assault, it is shown by the evidence that while the bat used by Wolters was of a brand carried by appellant's sporting goods stores, there is no evidence that any of the stores were located in San Antonio. There is no evidence from which it can be inferred that the bats in question came out of any of appellant's stores. There is no evidence that the brand of the bats were common or uncommon, or that the bats were sold exclusively by appellant's stores. The evidence simply shows that Smith was in possession of the bats when he, Wolters and Lee left San Antonio. There is no evidence as to how Smith came to be in possession of them. While there is some evidence which supports an inference that appellant might use a baseball bat if, he, personally, intended to beat up Brink, when all of the evidence in this case is analyzed, there is no evidence which supports an inference that appellant directed Smith, or anyone else, to use a baseball bat in the attack on Brink.

Reduced to basics, according to Wolters, Smith gave three reasons why "the man" was to be beat up. They were: *first,* it was in relation to a woman that was being seen by the man to be beat up and another man; *second,* "the (other) man had been beaten up and his head had been stuck in a toilet"; and *third,* "the man" was to be beat up because "this guy owed some money" ... and "it couldn't be collected." It is conclusively shown that the fight ensued when the two "lovers" of the woman suddenly came face to face in the hallway of their "lovee's" house. There is no evidence that Brink, at any time, stuck appellant's head in a toilet. There is no evidence that Brink owed appellant, or any other person, money. Even if it be inferred that Brink was beaten up as a result of an altercation with appellant over a woman, who, on May 15, 1980, was working as a secretary in the office where Brink was employed, the evidence shows that women other than Goodhew were working in the office at the time in question. Moreover, the statements that Brink was to be beat up because 1) he humiliated and stuck someone's head in a toilet, and 2) he had refused to pay someone some money, are inconsistent with appellant's guilt.

With respect to the telephone calls, the call received by Houck from a man who told her that his name was "Smith," could have been either a local or a long distance call. There is no evidence from which it can be inferred, without piling one inference on another, that this call was placed from the pay phone at Las Brizas. As to the long distance calls made on May 15, 1980, it is established that all calls were completed. However, the identities of the persons placing the calls and the identities of those

receiving them were not established by direct evidence, and there is no basis for inferring that any of those persons had anything to do with the assault on Brink. With the possible exception of the calls made from the pay phone at Las Brizas, all that is shown is that unknown persons talked, via telephone, with unknown persons. There is no evidence relating to the topics of conversation, nor is there any evidence which supports an inference that any of the calls related in any way to appellant's connection, if any, with Smith.

While someone used Murna Stout's telephone credit card to make long distance telephone calls, Smith was not shown to have been in possession of the card on May 15, 1980, nor was it shown that Murna Stout ever loaned her card to Smith or authorized him to use the card. Assuming that Smith did make the calls to the Murna Stout residence, the only permissible inference is that he was calling home for reasons known only to him. Moreover, there is no showing that a person was required to have a credit card in his possession in order to charge a long distance telephone call to a credit card. Any person who has memorized the credit card number could make and complete such a call. Therefore, the fact that Murna Stout's credit card was found to be in Smith's possession about a month after the assault on Brink is of no significance regarding appellant's culpability, and does not, along with the other evidence and permissible inferences, tend to connect appellant with Smith.

As to the phone calls made from the Morehouse telephones to Taylor Brothers Jewelry store, and vice versa, the evidence shows that appellant and Morehouse were friends, who talked to each other frequently, and who had had business dealings with each other concerning Morehouse's purchase of jewelry from appellant. There is nothing in the record which will support an inference that these phone calls related to appellant's having solicited, encouraged or directed Smith to have Brink beat up. One of the telephone calls was made from a Morehouse telephone to the S.G. Taylor residence in Corpus Christi. The identity of

S.G. Taylor or of anyone living there was not established, nor was it shown that appellant lived there. The relationship, if any, between appellant and S.G. Taylor, or with anyone else who was living at the residence, was not established. There is no evidence that Steven Brown was involved in any way. He was a bail bondsman, but there is nothing to suggest that he was being contacted by Smith to arrange bail for either Wolters or Lee. There is no evidence that Smith, at the time he placed the calls to Brown, if he did place such calls, knew that Wolters and Lee had been arrested, nor is there any evidence that any of the persons who made any of the calls subsequent to 1:30 p.m. on the day in question knew that Wolters and Lee had been arrested.

There is also the matter of the statements made by appellant to Pannell, which were made about two weeks after the assault on Brink. While it is evident that appellant was in some kind of trouble, appellant did not tell Pannell what that trouble was, nor did he tell him that his trouble was connected in any way to the assault. The phrase "this baseball bat deal" was apparently used by appellant, but it was Pannell who *assumed* that appellant, in using the phrase, was referring to the use of baseball bats by Brink's assailants. Appellant mentioned no names nor did he tie the phrase into any specific date. Evidently, the grand jury was investigating appellant's possible involvement in the commission of some sort of a criminal offense at the time these statements were made. The indictment against appellant was not filed until January 9, 1981. None of the statements amounted to an admission by appellant that he had engaged anyone to commit an assault on Brink.

Motive was established. There can be no question but that the actual assault on Brink was carried out within the "time-frame" indicated by appellant in his threats previously made. Damaging and suspicious circumstances exist against appellant. However, the evidence, when considered in its entirety, merely raises a suspicion or

probability that appellant solicited, encouraged or directed Smith to have Brink beat up. Even if it is inferred that Smith, on May 15, talked to Morehouse, who, in turn, called appellant's office and then called Smith back, it still does not show that Smith or Morehouse, had any personal dealings with appellant with respect to the assault on Brink, which, at the time of the calls, had been accomplished. It is equally plausible to infer that Smith was looking for Morehouse or someone at the address called, and was known by Smith to be an acquaintance of appellant, and that the topics of such conversation did not involve appellant or his culpability. It could also be inferred that Smith expected Morehouse or someone at the address to be at appellant's condominium, but, not finding him or her, sought a key to leave some message inside; Smith could have then called Morehouse's residence to see if someone there knew where Morehouse, or the person he was attempting to locate, was, and someone at Morehouse's house then called appellant's office; not finding such person at appellant's office, the person at Morehouse's residence then called Smith back at the number Smith had earlier left. In the absence of the testimony of Smith, Morehouse or Murna Stout, the foregoing scenario is as plausible as any the State might suggest from the series of phone calls made to and from the two Morehouse telephones, and is not probative of appellant's guilt or even knowledge of the circumstances relating to the proposed, or completed assault on Brink. Again, it is noted that neither Smith, Morehouse, Murna Stout, Alan Brown nor Steven Brown were called to the witness stand by the State. No reason is shown in the record why they were not called.

The State failed to prove that Brink had had no other fights, that there were no other persons who were hostile to him, and that he had not been threatened by any other person. The above-mentioned romantic involvements, coupled with the fight and threats will not support any inference that appellant solicited, encouraged or directed Smith to arrange for Brink to be beat up.

The State did not negate the reasonable hypothesis that the baseball bats could have been obtained by Smith from someone other than appellant, or in sporting goods stores other than those owned by appellant.

Smith, in his statements to Wolters, merely explained that Brink was to be beat up for three reasons. Those statements do not exclude the reasonable hypothesis that some person other than appellant solicited, encouraged or directed Smith to have Brink beat up. The statements are just as consistent with the reasonable hypotheses that Smith was acting independently of appellant, or was acting in behalf of some person other than appellant, who had been humiliated by having his head stuck in a toilet, or someone who had been unable to collect money from "the man." There is no evidence of any kind of an association or contact between appellant and Smith, or appellant and Brink's assailants.

Considering all of the facts proved and permissible inferences drawn from such facts, we conclude, that unless an inference is piled on an inference, that the evidence was insufficient to show that appellant solicited, encouraged, or directed Smith "to solicit, or encourage or direct Kenneth Wolters to commit the offense of aggravated assault against Michael Brink." We further conclude that all facts proved by the State, together with permissible inferences, do not exclude every other reasonable hypothesis except the guilt of appellant. *Wilson v. State,* 654 S.W.2d 465 (Tex.Cr.App. 1983); *Sewell v. State,* 578 S.W.2d 131 (Tex. Cr.App.1979). The evidence is insufficient to sustain the conviction. Appellant's first ground of error is sustained.

Under the express holding of *Burks v. U.S.,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), and *Robinson v. State,* 570 S.W.2d 906 (Tex.Cr.App.1978), we have no choice but to reverse the judgment of the trial court and to reform the judgment to reflect an acquittal. It is so ordered.

The judgment of the trial court is REVERSED and is REFORMED to show an ACQUITTAL.

NYE, C.J., and GONZALEZ, J., concur.

KENNEDY, J., dissents.

UTTER, J., not sitting.

NYE, Chief Justice, concurring.

I concur in the result reached by the majority. In light of the recent decision by the Court of Criminal Appeals in *Wilson v. State,* 654 S.W.2d 465 (Tex.Cr.App.1983), I must reluctantly concur in the opinion of the majority of this Court. My reluctance is based solely on my tacit complicity in sanctioning what I believe to be a very confusing set of standards for the review of sufficiency of the evidence questions from trials based solely on circumstantial evidence.

Were we charged with the duty of viewing the evidence in the light most favorable to the jury's verdict, my position would be different, and I would agree with the dissent that the verdict and judgment should be affirmed. Until very recently, it was my understanding that, as an appellate court (especially the intermediate appellate court), we treated circumstantial evidence the same as direct evidence in determining its sufficiency to uphold a conviction. That is, we were required to view the evidence in the light most favorable to the jury's verdict. That position was also taken by our Court of Criminal Appeals in many, many cases. See, for example, *Hooker v. State,* 621 S.W.2d 597, 601 (Tex.Cr.App.1980) (opinion on appellant's motion for rehearing); *Vaughn v. State,* 607 S.W.2d 914, 919 (Tex.Cr.App.1980); *Brasfield v. State,* 600 S.W.2d 288, 290 (Tex.Cr.App.1980); *Miller v. State,* 566 S.W.2d 614, 617 (Tex.Cr.App. 1978); *Carlisle v. State,* 549 S.W.2d 698, 703 (Tex.Cr.App.1977); and *Brown v. State,* 475 S.W.2d 938, 944 (Tex.Cr.App.1971); *Jones v. State,* 442 S.W.2d 698, 702 (Tex.Cr.App. 1969). The rule in Federal cases that circumstantial evidence should be viewed in the light most favorable to the verdict when determining its sufficiency to support the conviction is the same as the rule that was in existence in Texas until changed most recently. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Alfrey,* 620 F.2d 551, 555 (5th Cir.1980); *United States v. Barrera,* 547 F.2d 1250 (5th Cir.1977); *United States v. Nazien,* 504 F.2d 394, 395 (5th Cir.1974), cert. denied 420 U.S. 964, 95 S.Ct. 1358, 43 L.Ed.2d 443 (1975). See also *United States v. Rusk,* 512 F.2d 815 (5th Cir.1975). For a general overview of this question see CORNELIUS, *"Appellate Review of Sufficiency of Evidence Challenges in Civil and Criminal Cases,"* 46 Tex.B.J. 439 (1983).

In *Hankins v. State,* 646 S.W.2d 191 (Tex. Cr.App.1983), the Court of Criminal Appeals, in a brief opinion, abolished the 127-year tradition in this State of charging a jury on circumstantial evidence. I believe that some kind of instruction is needed to guide the court and jury. The rationale used by the Court in its action was that, under the evidentiary system used by this State, circumstantial evidence and direct evidence are of equal weight. Therefore, it is confusing and misleading to charge a jury on circumstantial evidence because such a charge erroneously suggests to the jury that proof of circumstantial evidence is subject to a different standard than that of direct evidence. See *Holland v. United States,* 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954). The Court concludes "... that *there is but one standard of proof for criminal convictions* and where the jury is properly instructed on that standard, a charge on circumstantial evidence is valueless and invites confusion." (Emphasis added.)

In almost the same breath, the Court then decided in *Wilson v. State,* supra, that there is "... *a different standard of review* in circumstantial evidence cases." The Court instructs the bench and bar that reviewing courts must view the sufficiency of evidence in circumstantial evidence cases differently and apply a different standard than that used in reviewing sufficiency of the evidence in a direct evidence case.

I anticipate some additional confusion existing first with the trial juries trying to grapple with circumstantial and direct evidence without any instruction whatsoever except that the defendant must be found

"guilty beyond a reasonable doubt,"[1] and secondly with courts of appeals and then the Court of Criminal Appeals, in effect, substituting themselves for the jurors in determining the sufficiency of the evidence to meet this undefined standard. Absent the time-honored presumption that the jurors did what they were supposed to do, this chore becomes difficult at best to those of us on the intermediate appellate court level who have only the cold record to review and are not privileged to see and judge the demeanor and credibility of the witnesses.

For example, in a case in which the State's case is based solely on circumstantial evidence and the defendant offers eyewitness alibi testimony, are we to reverse a conviction because the alibi testimony precluded the exclusion of every other reasonable hypothesis except that of the guilt of the accused? Only the jurors can judge the truthfulness of the live testimony and the circumstantial evidence, and, absent a presumption in favor of their judgment, our role becomes one of speculation rather than determination when a sufficiency of the evidence question is raised on appeal in a circumstantial evidence case.

The Supreme Court of the United States said in *Holland,* 348 U.S. at 140, 75 S.Ct. at 137:

> "Circumstantial evidence in this respect is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more." (citations omitted.)

If there is any one thing that the people of this nation value more than any other thing about the entire judicial system, it is their faith in juries. This value is higher than the faith people have in their judges. It is my belief that we must strengthen this virtue, rather than undermine it. "Faith is to believe what you do not yet see; the reward for this faith is to see what you believe." St. Augustine.

The framers of the Texas Constitution conveyed to the courts of civil appeals final jurisdiction on all questions of fact, and this wisdom was carried forward when the current courts of appeals were created in 1981. Tex. Const. art. 5, § 6 (Vernon Supp.1982). Yet, in *Combs v. State,* 643 S.W.2d 709 (Tex.Cr.App.1982), the Court of Criminal Appeals attempted to answer this jurisdictional question by stating that sufficiency of the evidence questions in criminal cases, whether factually sufficient or legally sufficient, are all questions of law. However, in *Wilson,* supra, the Court of Criminal Appeals re-examined the record of evidentiary facts and circumstances for reasonable hypotheses other than guilt, rejected the view of the trial judge, the jury and the justices of the Court of Appeals who had already undertaken that task, and substituted their views for the others'. This was true even though the Court, in *Combs,* supra, stated that "if there is any evidence which establishes guilt beyond a reasonable doubt and if the trier of facts believe that evidence, the Court of Criminal Appeals is not in a position to reverse that judgment." Despite this language in the *Combs* case, the Court then turns around in the *Wilson* case and holds this is not to be the standard in circumstantial evidence cases and makes what I believe is a clearly factual determination in finding that evidence is insufficient to support a jury finding of guilt. I agree with many judges and lawyers that the function of the Court of Criminal Appeals is not that of "... an appellate arbiter over competing contentions of parties on direct appeal." *Wilson,* supra. (Clinton, J., dissenting.)

---

1. Texas being one of those states which has never permitted the submission of a definition of reasonable doubt.

Every appellant is entitled, under our system of jurisprudence, to one review of the factual determinations made in his case. However, as was intended by the framers of the Constitution and the legislature, and as has been acknowledged by our Supreme Court, that factual review is final with the courts of appeals. By their holding in *Combs,* the Court of Criminal Appeals has now created two complete factual reviews of criminal cases, and in so doing, has greatly diminished the constitutional jurisdiction of the courts of appeals.

If I viewed the evidence in the light most favorable to the jury, I would hold that the cumulative force of the circumstances shown was sufficiently consistent with the State's theory of the appellant's guilt beyond a reasonable doubt and sufficiently inconsistent with any other reasonable hypothesis except that of the defendant's guilt. I would not substitute my judgment for that of the twelve men and women who found the defendant guilty.

However, since that is not now the standard under which we, as an intermediate appellate court, are required to decide this case, I must vote to reverse the judgment and set the defendant free. See: *Wilson v. State,* supra. I concur in the judgment of the majority.

GONZALEZ, Justice, concurring.

I concur with the results reached by the majority. The State failed to prove a conspiracy between Taylor, Smith and Wolters thereby making the statements made by Smith to Wolters inadmissible and it was reversible error for the trial court to admit them. Without these statements, the conviction cannot be sustained. In order for statements made by an alleged co-conspirator be admissible, there must be evidence outside of and independent of the statements which tends to establish the joint act of the parties. *Chapman v. State,* 470 S.W.2d 656 (Tex.Cr.App.1971); *Denney v. State,* 558 S.W.2d 467 (Tex.Cr.App.1977).

However, I deplore the fact that the Court of Criminal Appeals can disturb the findings and conclusions of the intermediate appellate courts of this State with respect to sufficiency of the evidence anytime it chooses to exercise discretionary review where the jury has been instructed as to the proper standard of proof. See *Wilson v. State,* 654 S.W.2d 465 (Tex.Cr.App.1983) and *Thomas v. State,* 645 S.W.2d 798 (Tex. Cr.App.1983). In both of these cases, the Court of Criminal Appeals substituted its judgment for the judgment of the courts of appeals.

Admittedly, these are matters about which reasonable men differ. Are the judges of the Court of Criminal Appeals "more reasonable" than the judges of the courts of appeals? If the Court of Criminal Appeals is going to completely disregard the findings and conclusions of the courts of appeals in these matters, it makes little sense for us to waste our time in sifting through the record in determining whether reasonable hypotheses other than guilt have been excluded. This makes our opinion academic and an exercise in futility. Frankly, we could put our time to better use. Therefore, I recommend that the Court of Criminal Appeals and/or the Legislature re-examine this whole question.

KENNEDY, Justice, dissenting.

I respectfully dissent. It is fundamental to the law pertaining to circumstantial evidence that each case must, of necessity, be tested by its own facts to determine the sufficiency of the evidence. *Faulk v. State,* 608 S.W.2d 625 (Tex.Cr.App.1980). In applying the test of sufficiency to any set of facts, we are guided by certain rules announced at various times by our Court of Criminal Appeals. These rules were summarized in *Nathan v. State,* 611 S.W.2d 69 (Tex.Cr.App.1981) as follows:

"It is well established that a conviction on circumstantial evidence cannot be sustained if the circumstances do not exclude every other reasonable hypothesis except that of the guilt and proof amounting only to a strong suspicion is insufficient. [Citing authority.]

In circumstantial cases it is not necessary, however, that every fact point directly

and independently to the defendant's guilt. It is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. [Citing authority.] The rules of circumstantial evidence do not require that the circumstances should to a moral certainty actually exclude every hypothesis that the act may have been committed by another person, but the hypothesis intended is a reasonable one consistent with the circumstances and facts proved, and the supposition that the act may have been committed by another person must not be out of harmony with the evidence. [Citing authority.]

In determining whether incriminating circumstances are sufficient, each case must be tested by its own facts. [Citing authority.]

*     *     *     *     *     *

'Ordinarily, the test on appeal is whether there was evidence from which the jurors (advised on the restrictions the law places upon them in condemning one on circumstantial evidence) might reasonably conclude that every reasonable hypothesis other than guilt was excluded. [Citing authority.] Mere presence in the vicinity of a crime, even when coupled with flight, is not alone sufficient to sustain a conviction. [Citing authority.]'

These are the parameters one enters when he views circumstantial evidence in the abstract, and they are wide and broad parameters, indeed.

Very recently, within these broad parameters, in *Tommy Virgil Thomas v. State,* 645 S.W.2d 798 (Tex.Cr.App.1983), the Court of Criminal Appeals upheld a conviction for burglary where appellant was seen outside of the house burglarized holding a screwdriver and saying "I didn't find what I was looking for so I got this." The screwdriver was not further identified as either stolen property or as the means of entry. There were very few other circumstances tending to prove the defendant's guilt. In affirming the conviction, the Court noted that each of the circumstances standing alone

had only slight probative value but that, considered together, they were sufficient.

In the case before us, the State has listed in its brief the following (borne out by the record) as circumstances of appellant's guilt:

Goodhew worked for appellant and had a lengthy affair with him.

Brink and Goodhew began dating regularly in February 1978.

Brink and appellant engaged in an affray because of Goodhew in March 1978.

Brink's subsequent telephone call to appellant, during the course of which Brink apologized for his conduct, was terminated by appellant's threat to "send some guys to get" Brink.

Goodhew left her employment with appellant two weeks after the fight between Brink and appellant. Despite frenzied efforts by appellant to regain Goodhew's favor, she spurned him. During the course of this romantic pursuit appellant advised Goodhew he would not harm Brink if she returned to his employ, but if she refused he would wait a "couple" of years and then "get" Brink.

Appellant's hostility toward Brink and Goodhew is evidenced by a letter apparently written by him and sent to Brink along with a photograph of Goodhew nude. Only appellant ever took nude photographs of Goodhew.

Approximately 26 months after the March 1978 incident Brink was indeed attacked by two individuals, Wolters and Lee.

Appellant was very active in softball, and owned sporting goods stores. The bats used to attack Brink were supplied by Smith and were a brand carried by appellant's businesses. After the March 1978 affray appellant informed Goodhew that if he'd been armed with "his bat" Brink would not have prevailed.

Wolters identified Smith as the leader of their sordid trio and supervisor in launching the attack. Smith initially met with Wolters and Lee in attorney Allen Brown's San Antonio offices. Shortly af-

ter the attack Smith was identified seeking entry to appellant's condominium apartment. Smith apparently contacted appellant's office directly seeking the key.

Smith informed Wolters the attack was to avenge a man previously beaten and humiliated by Brink because of a woman with whom both were romantically involved; this corresponds with the March 1978 incident involving Brink and appellant.

Smith's description of the previous incident suggested the affray took place in a bathroom, also consistent with the March 1978 incident.

Smith indicated the female responsible for the previous incident worked in the same office as Brink; Goodhew was indeed employed by the same law firm as Brink.

Appellant made certain statements to Pannell in June 1980 tantamount to admissions or at least suggesting consciousness of guilt.

Applying the rules of circumstantial evidence quoted earlier to the evidence quoted above, and with *Thomas,* supra, in mind, I would hold that the totality of the above is sufficient to justify a jury's finding appellant guilty. I would affirm the judgment of the trial court.