**David Earl COMBS, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 286–82.

Court of Criminal Appeals of Texas, En Banc.

Dec. 8, 1982.

Gladys R. Goffney, Carol J. Carrier, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., and Ray Elvin Speece, Asst. Dist. Atty., Houston, Robert Huttash, State's Atty. and Alfred Walker, Asst. State's Atty., Austin, for the State.

## OPINION ON STATE'S PETITION FOR DISCRETIONARY REVIEW

TOM G. DAVIS, Judge.

Trial was before the jury upon appellant's plea of not guilty of murder. After finding appellant guilty, the jury assessed punishment at twenty years. The conviction was reversed by the First Supreme Judicial District Court of Appeals, 631 S.W.2d 534. We granted the State's petition for discretionary review in order to examine the Court of Appeals' holding that appellant's confession was improperly admitted into evidence and that there was insufficient evidence to prove cause of death.

Appellant was convicted of murdering two-year-old Tracy Bennett on December 31, 1978, by holding her head under water.

The Court of Appeals held, as a matter of law, that appellant was incapable of knowingly, intelligently, or voluntarily waiving his *Miranda* rights.

According to the Court of Appeals, the evidence showed that:

"1) When the rights were read to him he left his head bowed, not looking at the person reading him those warnings;

"2) The appellant only looked up on occasions at a pause or resistance or on a request;

"3) The appellant is a mentally retarded individual who had a functioning age level of 5 to 8 years;

"4) The appellant had an intelligence score from 55 to 70;

"5) The appellant had been placed in at least two mentally retarded homes or schools;

"6) The appellant had difficulty in remembering;

"7) The appellant might be able to understand if large amounts of time were taken with him;

"8) The appellant might be able to understand if simple words were used with him;

"9) The appellant was taking medications prescribed for him of 50 mgs. thorazine;

"10) The appellant was unable to read or write (which fact was determined by an assistant district attorney before the confession was taken);

"11) The appellant was asked at a point in the confession if he wanted to say anything else concerning the death of a child to which he replied 'no'; and then shortly thereafter, a new line of interrogation and replies thereto were recorded; and

"12) When the appellant was asked about his understanding of his rights and about the provisions of the warnings, such as the use of such terms as 'used in evidence in court,' 'appointed,' 'lawyer,' etc., the appellant did not know what they were or what they meant."

The Court of Appeals also stated that, "From the evidence of all parties testifying in Court, it appears that the appellant never had a full realization of 'knowingly' waiving his statutory and constitutional warnings."

The Court of Appeals decision failed to mention the trial court's findings of fact on the issue of the voluntary nature of the confession. In finding that the confession was voluntarily made, the trial court noted, inter alia:

"1. That immediately prior to the defendant's arrest on January 1, 1979, the defendant was in the custody of Wayne N. Bearden, a police officer with the City of Houston, the defendant acted normal, sober, alert and coherent and was not mistreated in any way.

"2. That Houston Police Officer P.J. Schneider took custody of the defendant for arrest purposes on January 1, 1979 at approximately 3:30 in the afternoon. At that time Officer Schneider [gave the defendant the standard *Miranda* warnings] . . . The defendant indicated he understood his rights.

"3. At approximately 4:15 p.m. the defendant was turned over to the custody of Houston Police Officer Charles Lively who read the same rights to the defendant that Officer Schneider did. The defendant indicated he understood his rights.

"4. The defendant was taken to the police station where Judge Lee Duggan met them, and during a private conversation with the defendant carefully explained to him his rights . . . .

"Each one of these warnings was explained to the defendant in language he could understand. The defendant affirmatively acknowledged understanding each right after Judge Duggan explained it to him.

"5. At approximately 6:30 p.m. Jerry Guerinot, an Assistant District Attorney working intake, arrived in the Juvenile Division of the police department and began talking to the defendant who he determined could not read or write.

"6. Because it was believed the defendant could not read or write, a tape recorder was acquired.

"7. At approximately 7:43 p.m. the defendant voluntarily discussed with Jerry Guerinot his involvement in the killing.

"8. This discussion was tape recorded and reduced to writing at about 8:15 p.m.

"9. The transcription was then read to the defendant by Jerry Guerinot page by page, line by line and word by word.

"10. The defendant acknowledged that all matters read to him were true and correct, and he printed his name to the written transcription in the presence of Jerry Guerinot and Detectives C.W. Lively and D.W. Smith.

"11. Jerry Guerinot saw the defendant again on January 3, 1979 at approximately 5:30 p.m. in the Juvenile Division of the police [department].

"12. Jerry Guerinot read the defendant his legal warnings, as appear on the page preceeding the defendant's transcribed statement marked Exhibit Number 2.

"13. Jerry Guerinot then re-read the defendant's transcribed statement exactly as he had done on January 1, 1979.

"14. The defendant once again acknowledged the truthfulness of all matters read to him and printed his name in the presence of Jerry Guerinot and Officers Donald W. Smith and R.D. Gonzales.

"14. During all conversations with officers and Jerry Guerinot the defendant was sober, able to understand and answer all questions.

"15. The defendant was never promised, threatened or coerced in any way to make him confess.

"16. The defendant never gave any indication to any officer as being mentally retarded or taking any kind of medication.

"17. The defendant never asked to have a lawyer present to consult with him.

"18. That even though the defendant has a low I.Q. and is not as mature and intelligent as the officers or Jerry Guerinot, there was no evidence of any over reaching because everyone who dealt with him were very patient and cautious to make sure he understood everything that was happening.

"The Court bases its finding in this case after carefully examining the demeanor and the manner in which each witness testified. The Court paid particular attention to the defendant's testimony and noticed that he understood the questions asked and was able to communicate proper responses."

In *Grayson v. State*, 438 S.W.2d 553 (Tex. Cr.App.1969), a psychiatrist and a psychologist testified that the appellant had an intelligence quotient of 51 and classified him as a low-grade moron.

This Court stated that, "Whether appellant had the mental competency or intelligence required to waive his right to remain silent and to have counsel present was for the court and the jury. The issue was fairly presented and resolved against appellant." 438 S.W.2d at 555. Accord, *White v. State*, 591 S.W.2d 851 (Tex.Cr.App.1979); *Bell v. State*, 582 S.W.2d 800 (Tex.Cr.App. 1979); *Nash v. State*, 477 S.W.2d 557 (Tex. Cr.App.1972).

The Court of Appeals also failed to mention that a competency hearing was held, after which the jury found appellant competent to stand trial.

In *Grayson v. State*, supra, at 555, we stated, "It is difficult to see how one accused of crime may lack sufficient intelligence to waive his right against self-incrimination and to counsel, yet be competent to stand trial; to understand the nature of the charge against him and to assist his counsel in preparing a rational defense."

Finally, the Court of Appeals decision ignored all of the State's evidence tending to show that appellant made a knowing, intelligent, and voluntary waiver of his constitutional and statutory rights.

Dr. Jerome Brown, a clinical psychologist, testified for the State at appellant's competency hearing. All of the testimony from the competency hearing was admitted into evidence at the hearing on the voluntariness of the confession by stipulation of the

parties. Dr. Brown testified that he has conducted between twelve hundred and fifteen hundred competency and sanity evaluations since 1969 on people charged with crimes.

Dr. Brown characterized appellant as a person of limited intellectual ability, but he did *not* consider appellant to be incompetent, mentally defective, or mentally retarded.

Dr. Brown tested appellant and determined that his intelligence quotient was 75. This test score indicated that appellant was in the borderline area between mild retardation and normal but limited intelligence. Dr. Brown stated that the intelligence quotient range for people with mild mental retardation is roughly 65 to 75. Appellant's reading ability was at the second grade level.

Dr. Brown thought appellant had the capability for higher achievement given the right conditions. Appellant was able to describe his behavior and events which took place on or about the time of the alleged offense and gave his own version of the events which supported his innocence. "He certainly knew that he was accused of doing something very bad. He knew what he was accused of and was able to account for himself."

Appellant, according to Dr. Brown, "is able to function independently and self-sufficiently but in a fairly limited and simple way." The appellant knew who and where he was and the doctor had no trouble getting information from him. "All I'm saying is that I felt that I didn't have to make a significant effort to communicate with him, and as long as I was willing to be patient and fairly direct and simple in my questions, then I had no trouble working with David."

Judge Duggan administered the magistrate's warning to appellant and testified that appellant appeared to understand the warning.

. Judge Duggan took appellant into a private room so that he could give him the warning outside the presence of any police officers. "[H]e and I carried on a short conversation, and rather quickly you can determine that a person is able to see, hear, and understand and respond to what's being said."

All of appellant's rights under Art. 38.22, V.A.C.C.P., were explained to him by Judge Duggan in plain and simple words that he could understand.

Appellant did not say or do anything memorable or out of the ordinary in front of Judge Duggan. The judge received verbal responses from appellant, made eye contact with appellant, and did *not* have to repeatedly ask appellant to raise his head.

All of the officers who were in contact with appellant throughout January 1, and January 3, 1979, as well as Assistant District Attorney Guerinot, testified that the appellant was sober and alert, understood what was being said to him, and did not say or do anything unusual.

Guerinot testified that appellant understood all warnings given to him and voluntarily waived his *Miranda* rights. All officers who testified concerning the various warnings that were read to appellant on January 1, agreed that he appeared to understand the warnings and did not display unusual behavior. Most of these witnesses acknowledged that appellant is a person of limited intellectual ability.

The standards to be used in determining whether a person of limited intelligence has voluntarily waived his constitutional rights were discussed by this Court in *White v. State,* supra. That discussion, in light of the decision of the Court of Appeals, bears repeating:

"Appellant relies upon testimony that various tests showed he had an I.Q. of 75, 84 and 86, placing him within the range of a borderline mentally retarded classification, in the lower three percent of the population in intelligence.

"This question was addressed in detail in *Nash v. State,* 477 S.W.2d 557. (Tex.Cr. App.1972), wherein we concluded:

"'Having determined that waiver is permissible, we turn to appellant's con-

tention that the waiver or waivers were not knowingly and voluntarily made. He primarily relies upon evidence of his "mental and intellectual handicap," his intelligence quotient of 76, intelligence-emotional level of a 12 year old, a marked tendency to be highly suggestible, easily persuaded and gullible.

" 'In *Grayson v. State,* 438 S.W.2d 553 (Tex.Cr.App.1969), this court held that whether a defendant had the mental competency or intelligence required to waive his right to remain silent and to have counsel present prior to the giving of a confession was for the court and the jury, and the testimony of psychiatrist and psychologist concerning defendant's IQ, was not conclusive and did not require finding that the State failed to demonstrate intelligent waiver of self-incrimination privilege and right to retained or appointed counsel. Such testimony showed Grayson had an intelligence quotient (IQ) of 51 and was classified as a low grade moron.

" 'In *Casias v. State,* 452 S.W.2d 483 (Tex.Cr.App.1970), this court said:

" ' "As in *Grayson v. State,* Tex.Cr. App., 438 S.W.2d 553, it is difficult to see how one accused of a crime may not have sufficient intelligence or mental ability to understand the content of his confession and yet be competent to stand trial, understand the nature of the charge against him and to assist his counsel in preparing a rational defense." '

"We find the evidence sufficient to support the trial court's finding that appellant had the mental capacity to understand the warnings and to affirmatively waive his rights. In view of the totality of the circumstances in the record, we conclude that appellant's confession in the instant case was freely and voluntarily given after he had been apprised of his constitutional rights and had affirmatively waived those rights...."

■ Our review of the record dictates that appellant was mentally capable of making a knowing, intelligent, and voluntary waiver of his constitutional rights.

The Court of Appeals also held that the evidence was insufficient to prove cause of death. The State contends that, viewed in the light most favorable to the verdict, the evidence was sufficient, and that, "the panel of the Court of Appeals substituted its judgment on the credibility of the evidence for that of the finders of fact in the trial court."

At the outset, we must decide whether our Court has jurisdiction to review sufficiency questions once they have been passed on by the Courts of Appeals. Art. 5, Sec. 6 of the Texas Constitution provides that the decisions of the Courts of Appeals, "shall be conclusive on all questions of fact brought before them on appeal or error." If sufficiency of the evidence is a "question of fact," then the decisions of the Court of Appeals on sufficiency questions would appear to be binding on our Court.

Before Art. 5, Sec. 6, was amended in 1981 it provided that the decisions of the Courts of *Civil* Appeals, "shall be conclusive on all questions of fact brought before them on appeal or error." This earlier version of Art. 5, Sec. 6, was enacted in 1891. Since that time the Supreme Court of Texas has on numerous occasions examined the meaning of the phrase "questions of fact" in the context of Art. 5, Sec. 6. We find the decisions of the Supreme Court in this area helpful in determining the intent of the framers of the amended version of Art. 5, Sec. 6 as it applies to the instant question. The only change between the earlier version and the amended version relevant to the issue before us is that the earlier version applied to the Courts of Civil Appeals and the current version applies to the Courts of Appeals, which have criminal as well as civil jurisdiction. Art. 1820, V.A. C.S., as amended by the 67th Legislature in 1981, provides:

"The judgments of the Courts of Appeals in civil cases shall be conclusive in all cases on the facts of the case."

The leading case on this point is *In Re King's Estate,* 150 Tex. 662, 244 S.W.2d 660,

662 (1952), where the Supreme Court stated that:

"... Article 5, § 6 of the Constitution, Vernon's Ann.St., ... requires the Court of Civil Appeals, upon proper assignment, to consider the fact question of weight and preponderance of all the evidence and to order or deny a new trial accordingly as to the verdict may thus appear to it clearly unjust or otherwise. This is the meaning given the constitutional phrase 'all questions of fact brought before them on appeal or error' of Sec. 6, supra. But for that interpretation there would be no 'questions of fact' for the Court of Civil Appeals to determine, ..."

In *King's Estate*, the petitioner had asked the Court of Civil Appeals for a new trial on the ground that the verdict was, "so contrary to the overwhelming weight of all the evidence as to be clearly wrong and unjust."

The Supreme Court held that the Court of Civil Appeals used an incorrect standard in overruling the petitioner's contention:

"The [Court of Civil Appeals] clearly based its judgment, in so far as the particular assignment is concerned, upon its application to the evidence of the legal proposition stated by it thus: 'If there is any evidence of probative force to support this finding of the jury, such finding is conclusive and binding on both the trial court and this court.' That rule, like the rule whereby the reviewing court looks only to the evidence favorable to the verdict, and the rule of whether reasonable minds could differ, applies, and applies only, to the question of whether the evidence as a matter of law requires a conclusion contrary to the verdict ... Such tests are not applicable to the question under consideration. The latter is one of fact .... The question requires the Court of Civil Appeals ... to consider and weigh all of the evidence in the case and to set aside the verdict and remand the cause for a new trial, if it thus concludes that the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust—this,

regardless of whether the record contains some 'evidence of probative force' in support of the verdict ... The evidence supporting the verdict is to be weighed along with the other evidence in the case, including that which is contrary to the verdict."

*In Re King's Estate,* supra, is still cited frequently today. In *Hall v. Villarreal,* 522 S.W.2d 195, 196 (Tex.1975), the Supreme Court stated:

"Although not complained of in Petitioner's motion for rehearing in the court of civil appeals or in a point of error in this Court, we are compelled to note that the court of civil appeals, 517 S.W.2d at page 329, included incorrect statements concerning the rule applicable to its consideration of factual insufficiency of the evidence points, as indicated by its conclusion:

"'... We will not disturb the fact findings if there is some evidence of probative force to support them, viewing the evidence in the light most favorable to the successful party and indulging every legitimate conclusion that is favorable to him.'

"For a statement of the proper standard to be used by the court of civil appeals in reviewing the factual sufficiency of the evidence, see *In re King's Estate* ... See also Calvert, 'No Evidence' and "Insufficient Evidence' Points of Error, 38 Tex.L.Rev. 361 (1960)."

See also *Glover v. Texas Gen. Indem. Co.,* 619 S.W.2d 400 (Tex.1981); *Stodghill v. Texas. Emp. Ins. Ass'n.,* 582 S.W.2d 102 (Tex.1979).

■ It is thus clear that the phrase "questions of fact" is, in the context of Art. 5, Sec. 6, a legal term of art signifying "questions of weight and preponderance of the evidence."

For our purposes, the matter is somewhat confused because the questions of weight and preponderance upon which the Courts of Appeals decisions are conclusive are often labeled "insufficient evidence" points.

For example, in *In Re King's Estate,* supra, at 661, the Supreme Court in discussing a "question of fact," noted, "It is not infrequently described as a question of 'sufficiency' of the evidence."

However, as then Justice Robert W. Calvert stated in *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 Tex.L. Rev. 361 (1960), an article cited almost as frequently as *In Re King's Estate,* supra, "[M]agic in words in points of error should be as extinct as the dodo bird . . . Expressions in points of error such as 'no evidence,' 'insufficient evidence,' 'no sufficient evidence,' 'no legally sufficient evidence,' 'against the great weight of the evidence,' 'contrary to the preponderance of the evidence,' ad infinitum, have definite connotations in the mind of an appellate judge, but, except in a very limited way, they are not, or at least should not be, controlling."

What is significant is what a court actually does when it relies on a point of error related to a particular procedural step in the trial and appellate process. The Courts of Civil Appeals in conclusively deciding "questions of fact" traditionally looked to all of the evidence and granted a motion for new trial if the finding of fact was so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust. To quote Justice Calvert, "In deciding points of this type a Court of Civil Appeals does not find facts; it only 'unfinds' a vital fact." 38 Tex.L. Rev. at 368.

 It is well settled that *our* Court does not have jurisdiction to pass upon the weight and preponderance of the evidence or "unfind" a vital fact. *Martin v. State,* 605 S.W.2d 259 (Tex.Cr.App.1980); *White v. State,* supra. More specifically, our determinations of sufficiency of the evidence have never involved passing upon the weight and preponderance of the evidence.[1]

 In deciding sufficiency of the evidence questions this Court views the evidence in the light most favorable to the verdict. *Garrett v. State,* 619 S.W.2d 172 (Tex.Cr.App.1981); *Rohlfing v. State,* 612 S.W.2d 598 (Tex.Cr.App.1981); *Vaughn v. State,* 607 S.W.2d 914 (Tex.Cr.App.1980); *White v. State,* 601 S.W.2d 364 (Tex.Cr.App. 1980); *Daniel v. State,* 577 S.W.2d 231 (Tex. Cr.App.1979); *Owens v. State,* 576 S.W.2d 859 (Tex.Cr.App.1979); *Vera v. State,* 499 S.W.2d 168 (Tex.Cr.App.1973); *Ames v. State,* 499 S.W.2d 110 (Tex.Cr.App.1973).

In *Banks v. State,* 510 S.W.2d 592, 595 (Tex.Cr.App.1974), we discussed the appropriate standard for review:

"[I]t is the province of the jury to judge the credibility of the witnesses and the weight to be given their testimony and it may resolve or reconcile conflicts in the testimony, accepting or rejecting such portions thereof as it sees fit . . . In reviewing the sufficiency of the evidence to support the conviction, we must view the evidence in the light most favorable to the verdict. In doing so, the verdict will be sustained if there is any evidence which, if believed, shows the guilt of the accused."

Accord, *Fernandez v. State,* 564 S.W.2d 771 (Tex.Cr.App.1978).

 Sufficiency of the evidence as determined by this Court is a question of law. It is irrelevant whether we as a court believe the evidence, or believe that defense evidence "outweighs" the State's evidence. If there is any evidence that establishes guilt beyond a reasonable doubt, and if the trier of fact believes that evidence, we are not in a position to reverse the judgment on sufficiency of the evidence grounds.

 Our Court also has occasion to pass on contentions that evidence is insufficient to support a conviction under the due process clause of the Fourteenth Amendment to the United States Constitution. The standard for such review was set out by the United States Supreme Court in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. Clearly, the federal constitutional standard is also a question of *law* and

---

1. We perceive no other standard may be utilized by the Court of Appeals in reviewing criminal convictions other than sufficiency of the evidence to support the conviction.

does not involve any weighing of the evidence:

"After *Winship* the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt' ... Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt ... This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weighter of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution. The criterion thus impinges upon 'jury' discretion only to the extent necessary to guarantee the fundamental protection of due process of law." 443 U.S. at 318, 319, 99 S.Ct. at 2788, 2789.

Thus, sufficiency of the evidence to sustain criminal convictions as determined by this Court is a question of law under both state and federal standards. It is not a "question of fact" under Art. 5, Sec. 6, of the Texas Constitution. We conclude that this Court has jurisdiction to review the sufficiency of the evidence to support a conviction even though that question has been addressed by the Courts of Appeals.

In the instant case, Dr. Robert Bucklin performed the autopsy on the deceased. He concluded that death was caused by drowning. Dr. Bucklin testified that had he seen certain photographs of the deceased, taken at the scene of the crime, before performing the autopsy, and had he received information that the deceased was alive after she was supposedly drowned in the bathtub, he might have reached a different conclusion as to cause of death.

According to the Court of Appeals, both the brother and sister of the deceased testified that she was alive after being drowned in the tub. Based on the testimony of Dr. Bucklin and the two children the Court of Appeals concluded that the State failed to prove cause of death.

The Court of Appeals ignored all of the evidence presented by the State which showed that drowning was the cause of death.

Most significantly, the opinion below fails to mention the testimony of Dr. Aurelio Espinola.

Dr. Espinola, a colleague of Dr. Bucklin, was called by the State to explain Dr. Bucklin's autopsy report. On the day Dr. Espinola was called, Dr. Bucklin was out of town. Contrary to the suggestion in the Court of Appeals opinion, Dr. Bucklin never testified for the State, but instead was called as a defense witness.

Dr. Espinola testified as to Dr. Bucklin's conclusions and his own conclusions concerning cause of death. Dr. Espinola's conclusions, some of which were later disputed by Dr. Bucklin, were based on factual matters contained in the autopsy report.

Dr. Espinola testified that the cause of death was asphyxia due to drowning. The factual findings in the autopsy report which led him to this conclusion were:

1. Frothy fluid coming out from the nostrils indicating fluid in the lungs.

2. Large amounts of fluid in the lungs coming out from the surface indicating aspirated fluid or drowning.

3. No evidence of neck injuries, ruling out strangulation which Dr. Espinola testified was the other cause of asphyxia.

4. No inflammatory process in the lung. If deceased had survived a few hours after drowning there would have been some inflammatory action.

5. Large release of fluid in lungs indicating death was not due to heart failure.

6. Absence of fresh bite marks on tongue indicating death was not due to convulsions.

Dr. Espinola further testified that his conclusions, based on the factual findings in Dr. Bucklin's report, were consistent with someone holding the head of the deceased under water.

■ Dr. Espinola's testimony, together with appellant's confession that he drowned the deceased, and the eyewitness testimony of the deceased's siblings that the appellant held the deceased under water until she drowned, established that the evidence was sufficient to support the conviction.

Additionally, even after Dr. Bucklin changed his testimony as to cause of death he admitted that the pathological evidence was consistent with death by drowning.

The testimony of the deceased's siblings was not as clearcut as the Court of Appeals opinion indicated. Both James and Renee Bennett gave conflicting testimony concerning whether the deceased was alive and walking around after the drowning episode. James was asked:

"Q. Okay. After he got her out of the bathtub, was she alive or was she dead?

"A. Dead.

"Q. And after she was dead, was she saying anything like that?

"A. No."

The holding of the Court of Appeals that the evidence was insufficient to prove cause of death is reversed.

We remand this cause to the Court of Appeals so that it can consider appellant's other grounds of error.

ROBERTS, CLINTON and TEAGUE, JJ., concur in the results.