**Chester Ray NEWSOME, Appellant,**

v.

**The STATE of Texas, Appellee.**

**Nos. C14–84–0782CR, C14–84–0783CR and C14–84–0784CR.**

Court of Appeals of Texas, Houston (14th Dist.).

Dec. 5, 1985.

Randy Schaffer, Houston, for appellant.

John B. Holmes, Dist. Atty., Winston E. Cochran, Jr., James Brough, Asst. Dist. Attys., Houston, for appellee.

Before JUNELL, ROBERTSON and CANNON, JJ.

## OPINION

ROBERTSON, Justice.

Appellant was indicted in three separate causes for aggravated robbery. The three cases were consolidated for trial. The jury rejected his plea of not guilty to each offense and assessed punishment at confinement for 95 years and a $10,000 fine in number 407720 and life and $10,000 fine in each of the other two cases. The appeals are likewise consolidated and the issues before us concern the sufficiency of the evidence in one of the cases, pre-trial identification procedures, admissibility of evidence of other robbery-rapes in the area and ineffective assistance of counsel. We affirm.

The records before us reveal that appellant was arrested on July 27, 1984 and that the next day he was charged with two cases of aggravated robbery (Nos. 407720

and 407725) and one case of aggravated sexual assault (No. 407722). At a hearing before the 182nd District Court on July 30th, the court ruled probable cause existed to detain the accused and responded to appellant's affidavit of indigency by appointing Rick Stover to represent him. The grand jury returned indictments against appellant on August 3rd, charging him with aggravated robbery in each of the three cases. Appellant appeared in court with his own counsel, Al Bonner, on August 14th. After arraignment, appellant entered a plea of not guilty to each offense, and trial was set before a jury for November 12. On October 12, 1984, the prosecutor filed and served upon appellant's attorney a "Motion to Consolidate" the three cases as authorized by Article 3.02, Texas Penal Code. At the beginning of trial, appellant was questioned and he expressly agreed to trying "all of these three cases at the same time."

While there is a challenge to the sufficiency of the evidence in only No. 407722 (where Yvonne Paris is the complainant), it is appropriate, in order to properly discuss appellant's contentions, to briefly discuss the evidence in each of the cases. Following his arrest, appellant was identified by the complainant in each of the cases as their assailant.

Yvonne Paris lived in a condominium apartment at 5210 Arboles, Number 1B. She stated that on December 26, 1983 her apartment was flooded from frozen and broken water pipes. Her landlord, who had assisted her in cleaning up, left about ten-thirty p.m.. She was expecting workers from a plumbing company who said they would be there "between 2:00 and 4:00 in the morning." In the meantime, she napped on the couch and got up about every half hour to vacuum the water from her kitchen. At about two-thirty a.m., as she was sleeping on her couch, she heard a knock on her kitchen door. She asked "who is it" and a voice replied "maintenance." Believing it to be the plumbers, she opened the door. Appellant, holding a gun, immediately stepped inside and forced her into the bedroom where he raped and robbed her. Finding a "Teller II" card, appellant told the complainant they would go to the Teller II machine at nearby Westbury Square and withdraw money. Appellant told the complainant to drive. As appellant was getting into her car, the complainant, believing she would be killed anyway, decided to attempt escape. She ran away, screaming, and was admitted into another apartment.

The complainant in No. 407,720, a 14 year old female, related that on January 29, 1984, she was spending the night with her sister and brother-in-law in their apartment No. 4 at 5200 Arboles. During the night, as she was sleeping in a sleeping bag on the living room floor, she was awakened by appellant as he tapped her on the cheek with a gun. He ordered her to undress, raped her, robbed her and then made her slip into her sleeping sister's bedroom and get her sister's purse. He then forced her outside and told her to start running. She did so. After a short time she returned, awakened her sister and told her what had happened.

The complainant in No. 407,725 lived with her eleven year old daughter at 5236G Arboles No. 1. She related how, at about 1:30 A.M. on May 2, 1984, she was awakened from sleep as she lay in her bed. Appellant, standing over her, stabbed her twice in the head and once in her thigh with her sewing shears. Appellant robbed her of her jewelry, took her outside and forced her to walk for some distance. He then attempted to rape her. She grabbed an ice pick or screwdriver from his hip pocket and stabbed him in the chest, and he again stabbed her with the sewing shears. He then forced her to walk into another yard where he forcibly raped her. Bright lights from Houston Police helicopters overhead interrupted appellant, and the complainant pushed appellant away, then got up and ran. In discussing appellant's contentions, references to other evidence heard by the jury will be made.

In his first ground of error, appellant contends the conviction for the offense

against Yvonne Paris is contrary to the great weight and preponderance of the evidence. The facts upon which appellant predicates his argument concern the complainant's initial report describing her assailant as having metal caps on "at least four [upper front] teeth." Initially, the state challenges the factual basis upon which appellant's argument is based because there is no evidence in the record that the appellant does not have four upper front teeth with metal caps on them. While this may be true, we pretermit a discussion of facts, for we believe the court of criminal appeals has settled the issue of whether a challenge to the sufficiency of the evidence in criminal cases is a "question of fact."

■ In *Combs v. State*, 643 S.W.2d 709 (Tex.Crim.App.1982) the court of criminal appeals had granted the state's petition for discretionary review. One of the issues before that court was a finding by the court of appeals that the evidence was insufficient to prove the cause of death. The state challenged this finding on the basis that the court of appeals had substituted its judgment on the credibility of the evidence for that of the finders of fact in the trial court. The court reviewed the authority of the courts of appeals to pass upon challenges to the sufficiency of the evidence in civil cases and to unfind a vital fact. The court then said:

> It is well settled that *our* Court does not have juridiction to pass upon the weight and preponderance of the evidence or "unfind" a vital fact. (citing cases). More specifically, our determinations of sufficiency of the evidence have never involved passing upon the weight and preponderance of the evidence. (emphasis theirs).
>
> In deciding sufficiency of the evidence questions this Court views the evidence in the light most favorable to the verdict. (citing cases)
>
> .    .    .    .    .
>
> Sufficiency of the evidence as determined by this Court is a question of law. It is irrelevant whether we as a court believe

the evidence, or believe that defense evidence "outweighs" the State's evidence. If there is any evidence that establishes guilt beyond a reasonable doubt, and if the trier of fact believes that evidence, we are not in a position to reverse the judgment on sufficiency of the evidence grounds.

Finally, the court concluded:

> Thus, sufficiency of the evidence to sustain criminal convictions as determined by this Court is a question of law under both state and federal standards. It is not a "question of fact" under Art. 5, Sec. 6, of the Texas Constitution. We conclude that this Court has jurisdiction to review the sufficiency of the evidence to support a conviction even though that question has been addressed by the Courts of Appeals. *Combs* at 716–717.

Following this reasoning, the Dallas Court of Appeals found that a court of appeals does not have the "authority to set aside a fact finding in a criminal case on the ground that it is contrary to the overwhelming preponderance of the evidence." *Arvay v. State*, 646 S.W.2d 320, 322 (Tex. App.—Dallas 1983, pet. ref'd.). We agree. Appellant's first ground is overruled.

■ In his second ground of error appellant contends the convictions "must be reversed because of unconstitutional pre-trial identification procedures." While acknowledging that appellant's trial counsel did not object at trial to the in-court identification, appellant's present counsel asks us to apply the reasoning of the First Court of Appeals in *Perry v. State*, 669 S.W.2d 794 (Tex.App.—Houston [1st Dist.] 1984, pet. granted). The court found there that not only is it not necessary to "specifically assign error regarding unconstitutional identification" in order to have the appellate court review the issue, it is not even necessary to make objection at trial. *Perry* at 801. We decline to follow this case because we do not believe it correctly applies Texas law. The court of criminal appeals in *Parker v. State*, 649 S.W.2d 46 (Tex.Crim.App.1983) sets forth the rule which we must follow: "Texas has long

had and enforced a contemporaneous objection requirement. Even a constitutional error may be waived by failure to object." *Parker* at 55. Appellant's second ground is overruled.

In his third ground appellant contends the trial court reversibly erred in permitting a detective to testify that there had been twenty-six robbery/rapes in the Westbury area with the same modus operandi as the offenses on trial, and these offenses ceased after the arrest of appellant.

■ The factual setting for this contention is as follows: The prosecutor called Detective King of the Crime Analysis Section of the Houston Police Department. On direct examination he testified, without objection, that it came to his section's "attention that there were a number of robbery/rapes in the Arboles area" and he then described what they did in setting up surveillance in an attempt to identify and arrest the person or persons involved. Finally, he described the events as they occurred during the morning hours when appellant was arrested. On cross-examination, he testified in response to questions from appellant's counsel that there had been "approximately twenty-six" rapes and robberies in the Westbury area in which the "same M.O., doing the same things, the same type of things being said, the same type of things being done in all of these cases" was a common denominator. On redirect examination the following occurred:

Q. But, the rapes and robberies that were going on stopped in that area since his arrest?

A. Yes.

There was no objection.

In his argument under this ground, appellant states "the failure to timely object to inadmissible evidence waives error unless the evidence is so prejudicial that no instruction to disregard could cure the harm." As authority for such statement he cites *Plunkett v. State*, 580 S.W.2d 815 (Tex.Crim.App.1979), *reh. denied*, 591 S.W.2d 907 (Tex.Crim.App.1980). Appellant then states: "[f]or appellate purposes,

the issue must be analyzed just as it would be had appellant objected, had the objection sustained, had the jury instructed to disregard the evidence, had a motion for mistrial denied, and complained on appeal of the failure of the trial court to grant the motion for mistrial." We do not agree. First, as pointed out by the state, *Plunkett* did not involve the admission of evidence; it concerned argument. While we are aware that the court of criminal appeals has fashioned a rule that if argument of the prosecutor is so prejudicial that an instruction to disregard could not cure the harm, a failure to object is not fatal, we are not aware of this rule being applied to the *admissibility of evidence*. Our research has not revealed such a case, nor has appellant cited any. Second, as stated in discussion of the above ground of error, Texas follows the contemporaneous objection rule. *Parker*, 649 S.W.2d 46. Having failed to object, nothing is preserved for review. Appellant's third ground is overruled.

In his fourth ground of error, appellant contends the conduct of trial counsel denied appellant the effective assistance of counsel and a fair trial. We take the opportunity to commend most able appellate counsel for both appellant and the state for exceptionally well-prepared briefs. Appellant's counsel has catalogued an impressive list of nineteen separate matters that trial counsel either did or failed to do. While this ground of error has given us much concern, in studying the total record and applying the case law as we understand it, we conclude that, at least on the basis of this record, appellant has failed in his burden to prove the lack of effective assistance of counsel. It must be remembered that the issue of ineffective assistance of counsel was first raised in the brief on appeal. There has been no evidentiary hearing where the attorney now complained of would be subjected to examination and cross-examination concerning his reasons for either doing or not doing those things about which complaint is now made.

Having stated our conclusion, we now discuss appellant's contentions.

■ Basic to a discussion of the now popular charge of ineffective assistance of counsel are several well-established principles, the citation of authority for which is hardly necessary.

1. The right to effective assistance of counsel merely ensures the right to reasonably effective assistance.

2. The constitutional right to counsel does not mean errorless counsel whose competency or accuracy of representation is to be judged by hindsight.

3. Judicial scrutiny of counsel's performance must be highly deferential, and every effort made to eliminate the distorting effects of hindsight.

The court of criminal appeals has further stated that "[a] full inquiry into the strategy or tactics of counsel should be made only if from all appearances after trial, there is no plausible basis in strategy or tactics for his actions." *Ex parte Burns*, 601 S.W.2d 370, 372 (Tex.Crim.App.1980). We believe this, simply stated, means if there is any basis for trial strategy to have been a reason for trial counsel's action, then further inquiry is improper.

Now, with the U.S. Supreme Court decision of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed. 674 (1984), we are further guided in our determination of this often delicate problem. In brief and oral argument counsel pointed out that the court of criminal appeals has not yet adopted the *Strickland* test for Texas. While this may be true, that court's reference to the case, at least without disapproval, indicates to us the test is applicable in this state. *Moore v. State*, 700 S.W.2d 193, 71 at 21 (Tex.Crim.App.1985); *Moore v. State*, 694 S.W.2d 528 (Tex.Crim.App.1985); *Ingham v. State*, 679 S.W.2d 503 (Tex. Crim.App.1984). In fact, our court has already applied the *Strickland* test. *Morris v. State*, 696 S.W.2d 616 (Tex.Crim.App. 1985). In referring to *Strickland*, the court of criminal appeals recently said:

In *Strickland*, the Supreme Court enunciated a two-pronged test to determine whether counsel was ineffective in his assistance at trial. To paraphrase, the defendant must first show that counsel's performance was deficient, i.e., that his assistance was not "reasonably effective." Second, and assuming the defendant has first shown ineffective assistance, the defendant must affirmatively show prejudice. That is, the defendant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. We need not analyze this case in light of the two-pronged *Strickland* test, however, because we do not find that appellant's counsel was ineffective as our prior decisions construe that term or that he was not "reasonably effective" as the Supreme Court construes that term. *Ingham* at 508–509.

Applying the reasoning of these cases to the case now before us, we will examine those matters alleged to show ineffective assistance of counsel and determine:

1. was there a plausible basis in strategy or tactics for trial counsel's actions;

2. if not, was counsel ineffective as the prior decisions of the court of criminal appeals construe that term;

3. if so, has appellant satisfied the further *Strickland* test of affirmatively showing prejudice.

But, first, in the face of what appear to be such serious allegations made by appellant's present counsel, it is necessary to establish the setting in which this case was tried. State's counsel, in his brief, addresses in detail "The Defense Theory." He tells us "Defense Counsel Bonner's summation to the jury on the issue of guilt and innocence sets forth clearly the strategy on which he had based his conduct which is here, in hindsight, criticized by the appellant's counsel on appeal." We agree, and while it is lengthy, we will quote it in its

entirety, rather than paraphrase as the state has done.

"MR. BONNER: If it please the Court, Mr. Holliman, ladies and gentlemen of the jury, I would like to explain to you right off the bat that whatever happened to those three women was a very sad scene. If you noticed that during my cross-examination of these people, I never went into the actual act or acts of what happened to these people. We don't know what happened to them. Our position is we were not there. We didn't spend three or four weeks in here going over all of those gory details. It was a very sad day for each and every one of those females, and I don't want anybody in here to get the impression that I don't feel for them like everybody else does. It was a bad scene. But, now, I would like for you, if you will, and I think you have been fair all through this trial, when I asked you to not make any decision until all of the facts were in, and I think that's what you have done.

"What I would like for you to do at this time is to, if you can, sort of blot out in your mind right now for the purposes of final argument as to what has happened to the victims. We admit that something happened to them. Okay? That's not even at issue. The facts in the charges about these things, we assume they are true. So, you can just set that aside and that issue is dead. Those things happened to those ladies. Now, let's try to make an honest decision as to this person here and his involvement in this situation. All right?

"Now, the first thing I want to ask you is if you will just look around this courtroom here, make an observation. You have got to understand what we are talking about or what it started out to be that we are no longer talking about. It started out to be twenty-six rapes and robberies. The Westbury Rapist. It started out to be one of the biggest cases in Harris County. That's what this case started out to be. Let's not fool anybody. That's what this case was all about. They put Houston's finest on to this case. They put many, many man hours into this case. This is one of the biggest cases that ever hit this city, and they meant to get this Person [sic], and I suggest they do have him. I don't think he has gotten away. They do have him, but do you believe for one minute that we are talking about the Westbury Rapist? You don't see any TV cameras around. You don't see Channel 2. You have not see Channel 13. Do you believe this man here would be sitting here without the press? You couldn't have even gotten in the door even if the police department had felt this is their publicized case. This is the District Attorney's big case. You can just see by the quietness of this courtroom that there is something wrong here. The whole investigation went flat on them. The whole investigation went kaput. And, I will prove to you it did and I will show you why. They made a big deal about the first three ladies that made the identification or what have you, how fair it was and all of these type things. Of course, you heard Ms. Paris. She swore nobody showed her any pictures. The other two ladies admitted there were pictures involved, this man's picture here. I don't know who else they showed them to. But, now, just putting that in your mind and turning it over as you would do with just about anything else, I'm sure some over-zealous officer over there, not trying to do any harm to anybody, just really assumed this was the man. And, in showing pictures, talking about, 'Well, we caught him out there in the ditch, this would have to be the man because of this and that and the other.' You know. And, these distraught women, just three of them, nobody else, just these three, they were distraught. This bad situation happened to them. And, I am sure the police department really got hot behind it after they went down and checked his record and saw that he had some convictions and what have you. I can't do anything about that. I can't. I can only bring you what I have got. I want you to follow this along with what I am trying to suggest to you and see does it make sense. They were hot after this man. 'This is our man.' They even went out to one of the ladies' houses. 'We have to have this ra-

pist. He must be stopped.' And, I don't blame them. 'He must be stopped,' but I suggest to you that they don't have two or three other people backing them up. They don't have them backing them up. We have three people. When I got involved in the case, as you heard from the witness stand, we had another lineup. Okay? Now, Ms. Reid's daughter picks out this man who was in jail. Let's call him Roscoe. Roscoe doesn't want to add to his trouble. See, the man won't even look at anybody. He won't look at anybody. That's the man that was picked after I got involved. No prior pictures shown, no prior conversations. 'Just tell it like it is.' That's the man they picked. That's him in jail. But, now, you have a problem. You have got at least three people already, and I suggest to you this is when the other investigation petered out, after other folks started identifying Roscoe Jones. Everything else fell by the wayside. That was the end of it right there. But, now, you have already got this man charged with at least three of these cases. Now you have got him charged with three, and you have Roscoe Jones picked out by the other folks. Now, what are you going to do? Everybody admitted it's the same man. The investigator, the guy who was in the department and puts these pictures together. 'Let's put the pictures together.' Have you ever tried to work a puzzle where you've only got three pieces and you've got two or three missing? Ever try to work that kind of puzzle? Doesn't fit, does it? The point I am trying to make to you is that. What happened to those ladies is bad. It was a bad scene. But, now, the issue is: Is this the man with his bad record when he was a youngster? Is this the man? I suggest to you it's not. Why is it not? You can just tell it is not. There is nobody here. They are not standing out there. This is not their big case. If any person in here goes down to say, 'This is the man,' what can they do? They give this case to Mr. Holliman and say, 'Go try this man.' It is not the man. They know it and we know it. 'We have got two or three people on our side.' I will admit to you when I first got in the case, I thought it was just another one of these cases, but when other people started picking out somebody else—now, that's important because they certainly want to talk about a man's beard. They've got to back it up. He started growing a beard. You get into the argument, was it small or large or what have you. I don't want to get into that argument. You can take it for what it's worth, whether it was small or large and whatever. Chester Ray says he has been wearing a beard at least since October. I have no reason to doubt him. The picture looks like a full beard to me. I have no reason to doubt that. But, I don't want to get off on that rabbit trail, either, arguing about that beard. I don't think a beard changes a person that much. I honestly do not. But, I do think he had a beard when these offenses happened and the people described that man to a tee. 'This is the man we are talking about.' Everybody. All twenty-six of these people described this man here. They said he was over six feet tall, heavy, muscular build in the chest, and had short hair, and he was light skinned, and this is the man they described, and here he is right here in his jail clothes. 'That's him.' Now, you saw when they kept telling or kept trying to elicit about this person was wearing a skull cap or something like that. I know at least two of the witnesses said they saw the man without his hat on. At least somebody out of twenty-six would have seen a person without his hat on. Did you get the officer discussing about identification, why was that so important for him to skirt all around the world about that? 'Officer, aren't you-all trained in identification?' 'No.' Do you believe that? No. 'You mean you are an officer with thirteen years' experience and you have not had any training on identification?' 'No.' Well, I have been practicing law eighteen years, and I can tell you that's not so. I don't think you believed him when he said that. And, I think that he was just in his own way—you have got to understand that I am not talking about the police. I love the police. They protect me and you and everybody else. But, if we could get peo-

ple to say what they should say and let the chips fall where they may, and don't try to stack them or fix them up or whatever you want to do—you want something fair. That's all. He could have said, 'I am familiar with identification.' Certainly every police officer is. In fact, he's as familiar with identifications as he is with his pistol. He is trained to identify people immediately. See what I mean? I asked him to describe that man. He wouldn't do it. He never did it. I just left him alone. I said, 'Okay.' But, it was quite obvious that he could have said, 'Light-skinned guy, bald in the front.' He did not want to say that. I didn't press him. I let you get the impression about what you wanted to think about that. But, now, what I am trying to tell you is that all of these people here thought when they first started out with this thing, including the Complainants, that they really had this man here. He was there, and however way they identified him—I don't like that. I really do not like for a police officer to go to people's houses and show pictures. I don't know what they tell them. They come in and say, 'We didn't tell them this or that or the other.' The witnesses say they don't. You know how human people are. They had to tell them, 'we caught him in the area, in the ravine, and this has to be our man.' If you were shown a picture of this, that, or the other, and you view him in a lineup, what do you expect? They tried to tell you they didn't say anything.

"Let me show you something else about this case. They tried to tell you everybody was in the lineup. I'll tell you that's not true. Roscoe Jones is not in the lineup. Their own pictures do not back up their story. Roscoe Jones was not in the lineup when these people identified this man here. Do you see everybody in there is wearing a beard? Can you see that? Now, if you are supposed to be identifying somebody clean-shaven, why do we have beards? See what we had the second time around? See who they identified. These people were never shown Roscoe Jones. See what I mean? If this man had been here, then those people would have gone along with the other,

would have told them who it was. But, you heard the police officer. 'Yeah, they had an opportunity to view everybody.' I don't see Roscoe Jones there. And, you don't see him, either. So, these are the things that are inconsistent with their case. And, I still don't want people to get the impression I'm criticizing the police department. We have the responsibility to represent a person. It's our duty and our job to bring out as much of the inconsistencies as there are. And those are the things that make or break the case, are the inconsistencies. And that's basically what I am trying to do. I am not trying to criticize anybody. And, I felt for the victims. I'm not taking that lightly. We don't know anything about the victims. Our defense was simply ID, the bad identification. The identification is all wrong. Nobody else picked out the man. Other people have picked out Roscoe Jones.

"Now, let's talk about the night in question when Chester Ray Newsome was out there. Now, from the diagram on the board that I have seen, it's quite conceivable everything happened that he suggested happened. First of all, he said he had this altercation. He ducked through the back and between, down through this ravine. If we listen to the police officer's version of what was going on out there, I didn't see anywhere on that map there where there was any condominiums or anything he could be watching or getting to. There was a fence on this side and a big fence on the other side. He did exactly what he said. The officers backed that up. He came out of that prairie and came out to the streets. He made a stop-and-go-hiding-type action. You see, I can understand why he didn't go back and cross the street where he lived. And there is a situation of being in the wrong place at the wrong time.

"But, now, let's look at this situation. Looking at this man in short pants and a little T-shirt, not hiding anything, no weapons. He doesn't have anything. He is not the kind of person they are describing. He is very cooperative when they pick him up.

There was a lot mentioned by the officer about some conversations over there at the Seven-Eleven about what he said. And Ms. Reid got back up there and said what he said. I suggest Ms. Reid's daughter picked this man here. She said, 'That's the one that attacked my mommy. I was looking at him.' But, you see, they didn't show Ms. Reid that man. He was not here. See what I am saying? He was not there because if they put him in there, Ms. Reid would have picked him. They didn't put him there or Ms. Reid would have picked him. They told you he was there. He's not there—

"MR. HOLLIMAN: Object. Nobody ever testified that witness was in any other lineup.

"THE COURT: Stay within the record.

"MR. BONNER: And then when they did take his picture, that's when Chester Ray Newsome's problems started, after they went downtown and checked his record and saw he had been convicted of a couple of offenses. And, they were just sure. They were just sure, and you can't blame them. A whole department over there confined to this investigation. They were just positive that this was the man, just positive until this one here pops up.

"Now, we don't have any defenses to any of these offenses. As I suggested to you, our total defense is that it is not the man. This is not the man. And I have said, and I can't repeat myself too many times, that you have two or three people backing up that. This is not the man. The officer told you that nobody else has picked him. Nobody else. Now, I started to talk about what happens when these ladies pick out a man and what happens when the ladies first pick out Chester Ray Newsome, that he was charged with these offenses. That's the result of him being here today. I am sure the State is going to try to give you some malarkey about, 'We didn't have to charge him with this and that.' But, aside from all of that, what I am saying is where are the press? Where is Felicia Jeter and Marvin Zindler? Don't you think they would be over here if the police de-partment really told them, 'We've got the Westbury Rapist here'? 'There he is.' That's big news in this town. Did you hear anything about it last night? No. They are not talking about it because they know that is not the man. Out of twenty-six rapes and robberies, nobody said anything. I don't think they have even put two lines in the paper. They have already got the information on that. But, they still want to convict a person, and you have to go through this because you have had three people who initially came in and said, 'This is the man.' I suggest they really feel this is the man. I don't think any of those people were lying. They had traumatic experiences. I think the first lady said she had five inches of water in her apartment, and she was really beat. And, a lot of people will try to tell you if somebody sticks a gun in your face and all that, you will remember. I tell you that's not true. You can be so frightened and excited that later that's not exactly true. If somebody is standing with a gun in my face, and I will remember the person and he was this and he was that and all that, I'm not for sure I would remember. See, when I got involved in this case, they stopped passing pictures around, showing them to everybody and everything stopped. The whole thing stopped. Not that I was trying to be smart; not that I was trying to be slick or anything. I just want it to be fair. Just fair. When it got to be fair, it got to be nothing. That's the only thing you or I or anybody else would want. I wouldn't be standing here telling you this is an innocent man if I didn't feel within my heart that he is. Because you have got plenty of people backing you up to say he's innocent. But, you don't have to worry about Chester Ray Newsome. I will tell you he is innocent, and I will ask you to return a verdict of innocent. You don't have to worry about Chester Ray Newsome. It's Roscoe Jones. You don't have to worry about Chester Ray Newsome. You can leave here feeling pretty good. You don't have to worry about Chester Ray Newsome. Roscoe Jones is the man and they know it

and I know it. Thank you for your time, ladies and gentlemen."

Rather than list separately each of the actions or failure to act on the part of the trial counsel, we group some of them for discussion.

■ Appellant now complains trial counsel did not file any suppression or discovery motions. He correctly recognizes in his argument, however, that this "is not per se ineffective representation." We agree. Furthermore, the failure to file a motion to suppress may have been in furtherance of trial counsel's overall strategy.

■ Next, appellant complains that counsel agreed to consolidate into one trial the three robbery cases pending against appellant. From appellant's closing argument quoted above, it is readily apparent that a consolidated trial was called for by counsel's strategy. He apparently wanted the jury to know that of the twenty-six robbery/rapes which the police believed were committed by the same person, appellant was charged with only three. Additionally, he was assured, that in the event of conviction, the resulting sentences would automatically be concurrent.

■ Appellant complains of testimony from one of the complainants, developed by his trial counsel on cross-examination, that one of her neighbors who was present in court was also assaulted "by the same person." While engaging in such tactics was dangerous, this action obviously fits into trial counsel's strategy as shown by his argument that appellant had been mistakenly identified by the three who had identified him, and not identified by any of the other victims.

In separate instances appellant faults trial counsel for one, not challenging out-of-court identification procedures by two of the complainants, two, not objecting to testimony by two police officers concerning identification of photographs of appellant by victims and three, not objecting to testimony of one of the officer's concerning lack of identification of appellant by one of the victims. During presentation of evidence, trial counsel vigorously cross-examined the victims concerning the methods used by the police officers on photographic identification. As stated above, trial counsel's strategy was mistaken identification, which the trial court charged the jury on, even though he was not required to do so. In failing to challenge or object to the evidence above, trial counsel could have done so with the reasonable belief that such evidence would further his argument of mistaken identification.

■ Appellant now asserts trial counsel should have objected to certain evidence concerning subsequent fear and hardships suffered by one of the complainants. The admissibility of the evidence is not the question before us. But shown by the argument quoted above, trial counsel never questioned that the three complainants were raped and robbed. On the contrary, he agreed they had been taken advantage of and he sympathized with them. While a failure to object to this evidence may not have been called for by trial strategy, it cannot be said to be inconsistent therewith. Even if we should find this to amount to ineffective assistance of counsel, there is no affirmative showing of prejudice.

■ Next appellant complains extensively concerning Detective King's testimony concerning the surveillance and arrest of appellant, the number of robbery/rapes in the area and the fact that after appellant was arrested such offenses ceased. As shown by the argument quoted above, this reasonably appears to be a part of counsel's trial strategy. The testimony that the robbery/rapes in the area ceased with appellant's arrest is, without a doubt, most damaging. The manner in which it surfaced has been touched upon in discussion of appellant's third ground. In now discussing appellant's contention that this evidenced ineffective assistance of counsel, a more detailed discussion is in order. After the prosecutor's direct examination of the officer during which the facts concerning the arrest of appellant were developed, appellant cross-examined the officer at great

length to develop his theory of the case. He elicited that there had been twenty-six robbery/rapes in the area, all of them had similar "M.O.", the police officials believed all the offenses had been committed by the same person, and that the person committing the offenses used the creeks and bayous as access to and egress from the apartment complex. In addition he established that when they caught appellant "coming down this embankment" they were sure they had the right person, the officers did not check out the story appellant told them (that his life had just been threatened and he was running away from his assailant) and that the appellant had been through many lineups and nobody identified him. The testimony showed that the police investigation then ceased with the appellant's arrest. It is readily apparent that all this evidence was a part of counsel's trial strategy. The fact that in so developing this evidence counsel opened the door to the prosecutor proving the robbery/rapes ceased with appellant's arrest does not prove he rendered ineffective assistance.

■■■ Appellant next contends trial counsel should have objected to testimony by Detective Gallier of a statement appellant made to him following a lineup. The record shows there was an on-going discussion between the officer and appellant, at the conclusion of which appellant questioned: "[A]re you trying to play on my intelligence?". It was later developed that during the assault upon the complainant in No. 407,725 the attacker used the same phrase. We agree, at least on the basis of the record before us, that upon proper objection the jury should not have heard this evidence. We also fail to see how not objecting to this evidence could be said to have a plausible basis in strategy or tactics. The inquiry, of course, does not stop there. Our decision must be based on the record before us, however inadequate it may be. Based on the record, we believe a finding of ineffective assistance for counsel's failure to properly object would be unwarranted. This is true in light of the construction of ineffective assistance of

counsel set out in prior decisions of the court of criminal appeals. Even if we should so find ineffective assistance, appellant clearly has not complied with the *Strickland* test by affirmatively showing prejudice.

■■■ Next appellant contends counsel's assistance was ineffective for failure to object to impeachment of appellant with prior convictions for burglary, misdemeanor theft, driving while intoxicated and carrying a pistol. We agree with appellant that evidence concerning some of the criminal history of appellant would have been excludable upon proper objection. However, on the basis of the record before us, it appears there was a plausible basis in strategy or tactics for appellant not to object to this evidence. As shown in trial counsel's argument, he attempted to use the appellant's "bad record when he was a youngster" as an explanation for the police officer's strong belief that they had the right man after they checked his criminal record.

■■■ Finally, appellant contends trial counsel was ineffective for failing to object to the prosecutor's jury argument, "that the jury instruction regarding mistaken identification did not mean that the judge believed it," citing *McClory v. State*, 510 S.W.2d 932 (Tex.Crim.App.1974) and *Dunbar v. State*, 551 S.W.2d 382 (Tex.Crim.App.1977). The final ruling of the court of criminal appeals on the type of jury argument complained of in those cases may be open to argument. However, it is obvious that the jury argument before us, taken in its entirety, does not show ineffective assistance of counsel for failure of trial counsel to object. While the instruction on mistaken identification was not necessary, *Florio v. State*, 532 S.W.2d 614 (Tex.Crim.App. 1976), the trial court did give it at appellant's request. In commenting thereon, the prosecutor stated, without objection:

> The judge explains to you that the identity of the Defendant is an issue in this case. If you have a reasonable doubt as to the identity of the Defendant as the

person who committed any one of the offenses, you should find him not guilty. You should. I ask you to do that. Why is this in the charge? I explained to you the judge is like a referee. He doesn't take sides one way or the other. He's here to make and ensure that each side receives a fair trial. And, you get the law if the Defendant or anyone would take the stand and say, "The Defendant didn't commit the offense." The judge puts it in there in the charge. It doesn't mean he believes it or thinks it's probably right. It doesn't mean he disbelieves it or whatever. If someone takes the stand and says, "The Defendant didn't commit the offense," it must be included in the charge. Don't believe because it's there the judge believes the Defendant didn't commit it. Because, he is not allowed to express his opinions one way or the other. The judge explained that you are the exclusive judges of the evidence.

We do not find ineffective assistance of counsel for trial counsel's failure to object to this jury argument.

We have discussed at length appellant's contentions that this record shows appellant received ineffective assistance of counsel. The serious allegations made against trial counsel have called for extensive quotes from the record. This record presents a prime example of the problems in raising a claim of ineffective assistance of counsel on an inadequate record. The reviewing court is placed in the position of second-guessing trial counsel's actions or inactions. Based on this record before us, we reject appellant's contention that he was denied effective assistance of counsel. Appellant's fourth ground of error is overruled.

The judgment is affirmed.