IN THE COURT OF CRIMINAL APPEALS


OF TEXAS
 





NO. PD-1276-07






TOMMY G. LASTER, Appellant



v.



THE STATE OF TEXAS





ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW


FROM THE SECOND COURT OF APPEALS


TARRANT COUNTY





 Keasler, J., delivered the opinion of the Court in which Keller, P.J., Meyers,
Womack, and Hervey, JJ., joined. Cochran, J., filed a dissenting opinion in which
Price, Johnson, and Holcomb, JJ., joined.


O P I N I O N 



 Tommy G. Laster appealed his conviction, claiming that the evidence was legally and
factually insufficient. When reviewing the legal sufficiency of the evidence, the Forth Worth
Court of Appeals stated that circumstantial evidence of intent is reviewed less rigorously than
other elements of an offense. (1) This statement is incorrect. We, however, uphold Laster's
conviction because the evidence is legally and factually sufficient.I. Background After buying eggs for their mother at a convenience store on January 30, 2005, B.T.,
who was eight, and her brother, who was ten, began to walk home. While walking on the
sidewalk, B.T. pushed a bicycle, and her brother walked beside her. The children saw a man,
carrying a closed umbrella, walking toward them. To allow the man to pass, the children
leaned against a fence next to the sidewalk. Instead of passing by, the man grabbed B.T.'s
arm. The man then put his arm around B.T.'s waist and tried to pull her away. B.T. let go
of the bicycle and yelled for help. Her brother grabbed her hand, and a tug of war over B.T.
ensued. The man abruptly let go of B.T. when a driver honked the car's horn. The man then
continued to walk down the sidewalk toward the store. The children ran home and told their
mother that a man tried to take B.T.

 B.T.'s mother reported the incident to the police. Later that day, B.T.'s mother saw
a man walking down the street. The man, Tommy G. Laster, looked like the man that B.T.
had described to the police. B.T.'s mother called the police and continued to follow Laster. 
The police arrived and arrested Laster based, in part, on the children identifying him as the
man who grabbed and pulled B.T. After the police arrested Laster, he gave a written
statement describing what happened: 

 While [the children] were coming toward me, the voices in my head started
telling me that I would be better off dead. As I got closer to the kids and I was
watching them, the voices in my head told me to grab the little girl. The voices
were telling me to "Get her, get her." I grabbed her using my right arm around
her waist. I saw her long hair and the side of her face. I also saw the little boy
next to her. That is when I realized that I needed to let go of her because she
was a little girl and I knew how that would look to the cars going by. I was
thinking to myself, 'Did I actually grab her in the broad daylight with all of
this traffic[?] I must be nuts.' She looked at me. She looked scared and wide
eyed. I let her go and hurried my pace to get to the store . . . .


 Laster was charged with injury to a child and attempted aggravated kidnapping. The
jury convicted him of both counts, and the trial judge sentenced Laster to twenty years'
confinement for injuring a child and forty years' confinement for attempting to kidnap B.T. 

 On appeal to the Forth Worth Court of Appeals, Laster challenged only his conviction
for attempted aggravated kidnapping. (2) He alleged that the evidence was legally and factually
insufficient to prove that he had the intent to abduct B.T. (3) To prove that Laster had the intent
to abduct B.T., the State had to show that Laster specifically intended to secrete or hold B.T.
"in a place where [s]he [was] not likely to be found; or us[ed] or threaten[ed] to use deadly
force." (4) The court of appeals agreed with Laster that there was no evidence that he attempted
to use deadly force. (5) But the court of appeals affirmed Laster's conviction, holding that the
evidence was legally and factually sufficient to prove that Laster had the intent to hold or
secrete B.T. in a place where she was unlikely to be found. (6) Deferring to the jury's finding,
the court rejected Laster's argument that grabbing B.T. in a public place showed that he did
not intend to take her anywhere. (7) Rather, the court held that the "very brazenness and public
nature of [Laster's] actions" could lead a reasonable jury to infer that Laster did intend to
take B.T. (8) The jury was also free to reject Laster's argument that his confession showed his
intent only to grab B.T. (9) In the court's view, the jury could have reasonably inferred that
Laster tried to isolate B.T. from her brother and abandoned his plan only when he realized
the risk of being caught. (10)

 In dissent, Justice Dauphinot concluded that there was no evidence of Laster's intent
to take B.T. (11) She said that there were other reasonable explanations for why Laster grabbed
B.T. (12) For example, he wanted to steal her bicycle or sexually abuse her on the sidewalk. (13) 
Given these other explanations, Justice Dauphinot criticized the majority for holding that a
reasonable factfinder could infer that Laster intended to hold or secrete B.T. in a place that
she was unlikely to be found.

 Laster filed a petition for discretionary review, contending that the court of appeals
applied an incorrect standard of review by affording too much deference to the jury's fact
determination when evaluating the circumstantial evidence of intent. Laster also asked us
to adopt Justice Dauphinot's view that the evidence was legally and factually insufficient to
support his conviction. We granted review and now affirm the court of appeals's judgment. 

II. Sufficiency Standards of ReviewA. Legal Sufficiency 

 The Due Process Clause to the United States Constitution requires that a criminal
conviction be supported by a rational trier of fact's findings that the accused is guilty of every
essential element of a crime beyond a reasonable doubt. (14) This due process guarantee is
safeguarded when a court reviews the legal sufficiency of the evidence. (15) During such a
review, an appellate court must not usurp the role of the factfinder. (16) Appellate courts are
ill-equipped to weigh the evidence; unlike the factfinder--who can observe facial
expressions and hear voice inflections first-hand--an appellate court is limited to the cold
record. (17) Our role on appeal is restricted to guarding against the rare occurrence when a
factfinder does not act rationally, (18) and we have final jurisdiction to review the legal
sufficiency of the evidence. (19) When conducting a legal sufficiency review, a court must ask
whether "any rational trier of fact could have found the essential elements of the crime
beyond a reasonable doubt"--not whether "it believes that the evidence at the trial
established guilt beyond a reasonable doubt." (20) In doing so, we assess all of the evidence "in
the light most favorable to the prosecution." (21) We have said that this same standard applies
equally to circumstantial and direct evidence. (22) After giving proper deference to the
factfinder's role, we will uphold the verdict unless a rational factfinder must have had
reasonable doubt as to any essential element. (23) 

B. Factual Sufficiency 

 A verdict must also be supported by factually sufficient evidence. But unlike a legal
sufficiency review, which is a federal due process requirement, a factual sufficiency review
is a creature of state law. (24) On direct appeal, a court must begin its factual sufficiency review
with the assumption that the evidence is legally sufficient under Jackson. (25) Evidence that is
legally sufficient, however, can be deemed factually insufficient in two ways: (1) the
evidence supporting the conviction is "too weak" to support the factfinder's verdict, or (2)
considering conflicting evidence, the factfinder's verdict is "against the great weight and
preponderance of the evidence." (26) When a court of appeals conducts a factual sufficiency
review, it must defer to the jury's findings. (27) We have set out three "basic ground rules"
implementing this standard. (28) First, the court of appeals must consider all of the evidence
in a neutral light, (29) as opposed to in a light most favorable to the verdict. (30) Second, the court
of appeals may only find the evidence factually insufficient when necessary to "prevent
manifest injustice." (31) Although the verdict is afforded less deference during a factual
sufficiency review, the court of appeals is not free to override the verdict simply because it
disagrees with it. (32) Third, the court of appeals must explain why the evidence is too weak
to support the verdict or why the conflicting evidence greatly weighs against the verdict. (33) 
This requirement serves two related purposes. First, it supports the court of appeals's
judgment that a manifest injustice has occurred. (34) And second, it assists us in ensuring that
the standard of review was properly applied. (35) 

 Unlike our jurisdiction over legal sufficiency decisions, our jurisdiction over the court
of appeals's factual sufficiency decisions is limited. (36) The Factual Conclusivity Clause gives
final appellate jurisdiction to the court of appeals on questions of fact brought before the
court. (37) We review the court of appeals's factual sufficiency analysis to ensure that the court
applied the correct legal standard and considered all of the relevant evidence. (38) We do not
conduct a de novo factual sufficiency review. (39) If we determine that the court of appeals
applied the wrong standard or misapplied the correct standard, the case must be remanded
to the court of appeals to conduct a proper factual sufficiency review. (40)

 With the proper roles of the factfinder, the court of appeals, and our Court put into
perspective, we now evaluate the court of appeals's legal and factual sufficiency analyses.III. Analysis

 Laster claims that the court of appeals erred by finding that the evidence was legally
and factually sufficient to show that he intended to hold or secrete B.T. in a place where she
was not likely to be found. In doing so, Laster contends that the court of appeals incorrectly
applied a less-rigorous standard when reviewing the circumstantial evidence of intent. Laster
appears to argue that the court of appeals's misstatement of law affected both the court's
factual and legal sufficiency reviews. His argument, however, is not entirely clear because,
like the court of appeals, Laster combines his factual and legal sufficiency discussions,
thereby discounting any variance between the two standards. We have stated "that
determining the legal and factual sufficiency of evidence requires the implementation of
separate and distinct standards." (41) Courts and litigants should not combine their legal and
factual sufficiency analyses. So while we recognize that any analyses of the facts in a given
case will naturally overlap, a separate review under the applicable standard is necessary to
ensure that the law was properly applied. 

 After reading the court of appeals's opinion, we determine that Laster is partially
correct. The court of appeals applied the wrong standard only when reviewing the legal
sufficiency of the evidence. We, however, affirm the court of appeal's judgment because the
evidence is legally sufficient and the court of appeals applied the correct factual sufficiency
standard.

A. Standard of Review 

 Laster criticizes the court of appeals for applying an unduly lenient standard when
reviewing the circumstantial evidence of intent. Quoting our decision in Margraves v.
State, (42) the court of appeals stated that "[c]ircumstantial evidence of a defendant's guilty
knowledge is not 'required to meet the same rigorous criteria for sufficiency as circumstantial
proof of other offensive elements.'" (43) Laster contends that this statement represents a
holdover from the obsolete jury instruction on circumstantial evidence and is improper.

 On this point, we agree with Laster's reading of the court of appeals's opinion and
disavow any notion that circumstantial evidence of intent is reviewed less stringently than
any other type of evidence. The quoted language from Margraves was taken out of context
and is not part of our modern sufficiency review. Circumstantial evidence of intent must be
reviewed with the same scrutiny as other elements of an offense. 

 The passage in Margraves, cited by the court of appeals, was first articulated in our
Brown v. State decision. (44) The issue in Brown was whether the affirmative link test, used to
determine whether an accused intended to possess drugs, still applied after the reasonable
hypothesis test was abolished. (45) The reasonable hypothesis test developed out of our
suspicion of convictions based wholly on circumstantial evidence. (46) The test was
implemented at trial by instructing the jury that circumstantial evidence must "exclude, to a
moral certainty, every other reasonable hypothesis except the defendant's guilt." (47) The same
standard carried over on appeal to test the sufficiency of circumstantial evidence. (48) But once
we recognized that circumstantial evidence was as valuable as direct evidence, we abandoned
the reasonable hypothesis test. (49) 

 To explain why the affirmative link test survived the termination of the reasonable
hypothesis test, we pointed to opinions applying the affirmative link test but not mentioning
the reasonable hypothesis test. (50) We then downplayed the precedential value of drug cases
mentioning the reasonable hypothesis test. (51) We stated that, although the cases mentioned
the reasonable hypothesis test, the rhetorical recital of the standard "should not, however, be
taken to mean that circumstantial evidence of a defendant's guilty knowledge was required
to meet the same rigorous criteria for sufficiency as circumstantial proof of other offensive
elements" because the test was never applied. (52) We also noted that we rarely applied the
reasonable hypothesis test to circumstantial evidence of intent in any type of case. (53) While
circumstantial evidence of most elements warranted the reasonable hypothesis test, the test
was rarely applied to circumstantial evidence of intent because it was unworkable in that
context. (54) Excluding every reasonable hypothesis of what the accused was thinking was
close to impossible--only the accused can absolutely know his or her intent. (55) Because other
reasonable, noncriminal explanations for a defendant's conduct always exist, a true
application of the reasonable hypothesis analysis would lead to an acquittal in most cases. (56) 

 The court of appeals, in this case, and this Court in Margraves took the passage in
Brown to mean that circumstantial evidence of intent is to be reviewed less stringently than
circumstantial evidence of other elements. But any distinction between circumstantial
evidence of intent and other elements was rendered obsolete when the reasonable hypothesis
test was abandoned. Courts and juries no longer face the difficult task of excluding every
reasonable hypothesis other than the defendant's guilt. Under the current standard of review,
there is no reason to treat circumstantial evidence of an accused's mental state any differently
than circumstantial evidence of other elements. Just as circumstantial evidence is reviewed
under the same standard as direct evidence, circumstantial evidence of intent is reviewed
under the same standard as circumstantial evidence of other elements. In a sufficiency
analysis, all of the evidence admitted at trial to support the conviction should be reviewed
equally on appeal. 

B. Applicable Law 

 To prove that Laster committed the offense of attempted aggravated kidnapping, the
State was required to present sufficient evidence that Laster did "an act amounting to more
than mere preparation" with the specific intent to commit aggravated kidnapping. (57) A person
commits the offense of aggravated kidnapping if "he intentionally or knowingly abducts
another person" and commits an aggravating element. (58) Thus, two elements are required to
prove aggravated kidnapping: (1) intent or knowledge to abduct, and (2) commission of an
aggravating element.

 "'Abduct' means to restrain a person with intent to prevent his liberation by: (A)
secreting or holding him in a place where he is not likely to be found; or (B) using or
threatening to use deadly force." (59) "Abduct" then includes two elements. (60) First, the
defendant must have restrained another, which is the actus reus requirement. (61) Second, the
defendant must have had the specific intent to prevent liberation, which is the mens rea
requirement. (62) Secreting or holding another where he or she is unlikely to be found is part
of the mens rea requirement of the offense--not the actus reus. (63) This is an important
distinction because the State is not required to prove that the defendant actually secreted or
held another. (64) Instead the State must prove that the defendant restrained another with the
specific intent to prevent liberation by secreting or holding the person. (65) The offense of
kidnapping is legally completed when the defendant, at any time during the restraint, forms
the intent to prevent liberation by secreting or holding another in a place unlikely to be
found. (66)

 A kidnapping is aggravated when a defendant intentionally or knowingly abducts
another: (1) with the specific intent to accomplish one of six purposes or (2) "uses or exhibits
a deadly weapon during the commission of the offense." (67) The six purposes are as follows:

 (1) hold him for ransom or reward;

 (2) use him as a shield or hostage; 

 (3) facilitate the commission of a felony or the flight after the attempt or
commission of a felony; 

 (4) inflict bodily injury on him or violate or abuse him sexually;

 (5) terrorize him or a third person; or 

 (6) interfere with the performance of any governmental or political function. (68)

 Here, the State was required to prove that Laster committed an act beyond mere
preparation with the intent to secrete or hold B.T. and commit an aggravating element--not
that Laster could, or did, actually accomplish this purpose.

C. Legal Sufficiency Review 

 Laster argues that the evidence presented at trial was legally insufficient to support 
the jury's finding that he intended to hold or secrete B.T. in a place where she was unlikely
to be found. We disagree. 

 In support of his conclusion, Laster points to three circumstances that he contends
show that he had no such intent. We will consider each of these arguments in turn. 

 First, Laster suggests that the State did not prove that he intended to take B.T. because
he grabbed her in front of possible eyewitnesses. But the State did not have to prove that he
actually accomplished his purpose or even that he could have accomplished his purpose. (69) 
The State only had to prove that he had such a purpose. (70) Further, as the court of appeals
noted, the jury was not precluded from inferring that Laster intended to secrete or hold B.T.
in a place where she was unlikely to be found simply because he restrained her in public. (71) 
We have recognized that a rational factfinder can infer such an intent when a defendant
isolates a person from anyone who might be of assistance. (72) B.T. testified that Laster
grabbed her around the waist then tried to pull her away. Corroborating B.T.'s testimony,
her brother stated that when Laster tried to pull B.T. away, he grabbed her arm and pulled
back. The jury could reasonably infer from this testimony that by pulling B.T. away from her
brother, the only person available to help her, Laster intended to hold or secrete B.T. in a
place where she was unlikely to be found. 

 Second, relying on Justice Dauphinot's dissenting opinion, Laster argues that there
are other reasonable explanations for why he grabbed B.T. For example, he wanted to steal
her bicycle or sexually abuse her. Without proof that one explanation was more reasonable
than another, Laster contends, relying on Justice Dauphinot's reasoning, that the evidence
was insufficient. But this reasoning invades the factfinder's role. It is up to the factfinder
to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable
inferences from basic facts to ultimate facts." (73) By focusing on other reasonable alternatives
to explain why Laster grabbed B.T., Justice Dauphinot improperly applied the outdated
reasonable hypothesis construct, thereby placing herself in the "posture of a 'thirteenth
juror.'" (74) As long as the verdict is supported by a reasonable inference, it is within the
province of the factfinder to choose which inference is most reasonable. As stated above,
the evidence showed that Laster grabbed and then pulled B.T. toward him. Laster continued
to pull B.T. after her brother came to her aid. It was not until a driver honked the car's horn
that Laster released B.T. A factfinder could reasonably infer from this evidence that Laster
was planning to do more than just steal her bike or molest her. 

 Finally, Laster argues that the evidence showed that he intended only to grab B.T.
because his confession did not imply otherwise and he let go of her within a matter of
seconds. Contrary to Laster's claim that there is only one interpretation of his confession,
there is another rational interpretation. Laster not only said that the voices in his head were
telling him to "grab the little girl," but they were also telling him to "'[g]et her, get her.'" 
He confessed to restraining B.T. until he "saw the little boy next to her" and realized that he
"needed to let go of her because she was a little girl and [he] knew how that would look to
the cars going by." Even if this evidence was believed, a rational factfinder could infer that
Laster formed the intent to take B.T. when he grabbed her and abandoned his plan when he
realized that other people were witnessing his actions. Indeed, the evidence presented at trial
showed that Laster released B.T. when a driver honked the car's horn. Rather than
concluding that Laster released B.T. because he just wanted to grab her, viewed in the light
most favorable to the verdict, the evidence showed that Laster formed the intent to take B.T.
when he grabbed her and let go because he feared that he may be caught. (75) 

 In dissent, Judge Cochran claims that the evidence is legally insufficient to show
Laster's intent to (1) hold or secrete B.T. in a place where she was unlikely to be found, or
(2) commit an aggravating element. We will address both her contentions.

 Like Justice Dauphinot, Judge Cochran claims that she can only speculate about what
Laster intended when he grabbed B.T. She lists scenarios that Laster possibly could have
intended and concludes that, because the evidence does not support those scenarios, it cannot
support the jury's verdict. In doing so, she discards her robe, this time to assume the role of
a super-juror, (76) ready and willing to nullify the unanimous verdict of twelve individuals. 
However, as an appellate court, we are not permitted to supplant our judgment for that of a
rational factfinder--no matter how tempting. So while Judge Cochran purports to view the
evidence in the light most favorable to the prosecution, she ignores the evidence that supports
the jury's verdict that Laster intended to hold or secrete B.T. in a place where she was
unlikely to be found--Laster did not simply grab at B.T.; he pulled her away.

 Next, although Laster does not claim that the evidence supporting the aggravating
element is insufficient, Judge Cochran claims that it is. But the jury could reasonably infer
from Laster's actions that he intended to inflict bodily injury on B.T. Bodily injury is broadly
defined in the Penal Code as "physical pain, illness, or any impairment of physical
conduction." (77) This definition encompasses even relatively minor physical contact if it
constitutes more than offensive touching. (78) Direct evidence that a victim suffered pain is
sufficient to show bodily injury. (79) B.T. testified that she felt pain when Laster grabbed her
around the waist and pulled her. Because "[o]ne's acts are generally reliable circumstantial
evidence of one's intent," (80) the jury could reasonably infer that Laster intended to do exactly
what he did--to inflict bodily injury on B.T.

 Given the evidence presented at trial, a rational trier of fact, charged with discerning
Laster's intent from the surrounding circumstances, could have found beyond a reasonable
doubt that Laster intended to inflict bodily injury on B.T. and hold or secrete her in a place
she was unlikely to be found. Affording appropriate deference to the jury's verdict, we
therefore hold that the evidence supporting Laster's conviction is legally sufficient.

D. Factual Sufficiency Review 

 Laster also asks us to find that the evidence is factually insufficient. As stated above,
we are not, however, constitutionally permitted to conduct a de novo review of a court of
appeals's factual sufficiency decision. (81) Our jurisdiction is limited to reviewing whether the
court of appeals applied the correct rule of law. (82) We find that the court of appeals applied
the correct standard of review and considered all of the relevant evidence before finding that
it was factually sufficient. 

 The court of appeals's analysis followed all of the ground rules that are necessary to
ensure that the jury's findings are respected. The court of appeals considered all of the
relevant evidence, opposing and supporting the verdict, in a neutral light. The court
discussed the evidence that Laster argued opposed the verdict: he was on foot; he never used
a weapon; he never made any threats; he grabbed B.T. in public; he let go of B.T. quickly;
he continued walking to the store; and, he told police that he grabbed B.T. only because of
the voices in his head. The court then discussed the evidence supporting the verdict: Laster
was a total stranger to B.T.; Laster scared and surprised both children when he grabbed B.T.;
Laster tried to pull B.T. from her brother; and, Laster did not let B.T. go until a car drove by. 

 The court explained why, despite Laster's claim, the evidence was factually sufficient. 
Laster did not present any evidence at trial, so the only question that the court of appeals
faced was whether the State's evidence was so weak that the jury's determination was
manifestly unjust. (83) The State's evidence was largely based on the B.T's. and her brother's
credibility. The court of appeals properly deferred to the jury's determination that their
testimony was credible. Testimony that Laster tried to pull B.T. away from her brother and
let go only when a car drove by was enough to support the jury's finding that Laster
attempted to commit aggravated kidnapping. The court explained that the jury was free to
reject Laster's theory of the State's evidence and, instead, believe the children's testimony. 
Because the jury in this case was the final judge of witnesses' credibility, the court of appeals
was correct in upholding the jury's verdict. We find no error in the standard used by the
court of appeals or its application. 

IV. Conclusion

 We hold that the evidence was legally sufficient to support Laster's conviction for
attempted aggravated kidnapping. We also hold that the court of appeals properly applied
the law when it found that the evidence presented at trial was factually sufficient. We,
therefore, affirm the court of appeals's judgment. 


DATE DELIVERED: January 14, 2009

PUBLISH
1. Laster v. State, 229 S.W.3d 788, 791 (Tex. App.--Fort Worth 2007). 
2. Id. at 791 n.1.
3. Id. at 793. 
4. Tex. Penal Code Ann. § 20.01(2) (Vernon 2003). 
5. Laster, 229 S.W.3d at 793. 
6. Id. at 793-95.
7. Id. at 793.
8. Id. at 794.
9. Id. at 793.
10. Id. 
11. Id. at 795 (Dauphinot, J., dissenting).
12. Id. (Dauphinot, J., dissenting).
13. Id. (Dauphinot, J., dissenting).
14. Jackson v. Virginia, 443 U.S. 307, 316 (1979).
15. Id. at 319.
16. Moreno v. State, 755 S.W.2d 866, 867 (1988).
17. Id.
18. Jackson, 443 U.S. at 317.
19. Combs v. State, 643 S.W.2d 709, 717 (Tex. Crim. App. 1982), overruled on
other grounds by Butler v. State, 769 S.W.2d 234 (Tex. Crim. App. 1989).
20. Jackson, 443 U.S. at 318-19 (emphasis in original).
21. Id. at 319.
22. Burden v. State, 55 S.W.3d 608, 613 (Tex. Crim. App. 2001).
23. Narvaiz v. State, 840 S.W.2d 415, 423 (Tex. Crim. App. 1992).
24. Watson v. State, 204 S.W.3d 404, 406 (Tex. Crim. App. 2006). 
25. Jones v. State, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996) (citing Clewis v.
State, 922 S.W.2d 126, 134 (Tex. Crim. App. 1995)). 
26. Watson, 204 S.W.3d at 414-15. 
27. Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). 
28. Watson, 204 S.W.3d at 414. 
29. Id. 
30. Id.
31. Cain, 958 S.W.2d at 407. 
32. Id.
33. Watson, 204 S.W.3d at 414.
34. See Lancon v. State, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008).
35. Id.
36. Cain, 958 S.W.2d at 408. 
37. Tex. Const. art. V, § 6.
38. Lancon, 253 S.W.3d at 704. 
39. Id.
40. Cain, 958 S.W.2d at 408. 
41. Johnson v. State, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000). 
42. 34 S.W.3d 912 (Tex. Crim. App. 2000). 
43. Laster, 229 S.W.3d at 791 (quoting Margraves, 34 S.W.3d at 919). 
44. 911 S.W.2d 744, 747 (Tex. Crim. App. 1995). 
45. Id. at 745.
46. Hankins v. State, 646 S.W.2d 191, 207 (Tex. Crim. App. 1983) (Onion, P.J.,
dissenting).
47. Geesa v. State, 820 S.W.2d 154, 156 n.2 (Tex. Crim. App. 1991), overruled on
other grounds by Paulson v. State, 28 S.W.3d 570 (Tex. Crim. App. 2000). 
48. Girard v. State, 631 S.W.2d 162, 163 (Tex. Crim. App. 1982). 
49. Geesa, 820 S.W.2d at 155.
50. Brown, 911 S.W.2d at 746-47.
51. Id. at 746.
52. Id. at 747. 
53. Id. 
54. Matson v. State, 819 S.W.2d 839, 845-46 (Tex. Crim. App. 1991). 
55. Id. at 846. 
56. Id. 
57. Tex. Penal Code Ann. § 15.01 (Vernon 1994).
58. Tex. Penal Code Ann. § 20.04 (Vernon 1995). 
59. Tex. Penal Code Ann. § 20.01(2) (Vernon 2003). 
60. Brimage v. State, 918 S.W.2d 466, 475-76 (Tex. Crim. App. 1994). 
61. Id. at 476.
62. Id. 
63. Id. at 475. 
64. Id. at 476.
65. Id. 
66. Id. at 475.
67. Tex. Penal Code Ann. § 20.04(a)-(b).
68. Tex. Penal Code Ann. § 20.04(a).
69. Brimage, 918 S.W.2d at 476.
70. Id. 
71. Laster, 229 S.W.3d at 793; see Megas v. State, 68 S.W.3d 234, 241 (Tex.
App.--Houston [1st Dist.] 2002, pet ref'd).
72. Fann v. State, 696 S.W.2d 575, 576 (Tex. Crim. App. 1985); Megas, 68 S.W.3d
at 240.
73. Jackson, 443 U.S. at 319. 
74. See Geesa, 820 S.W.2d at 159.
75. Cf. Brown v. State, 98 S.W.3d 180, 188 (Tex. Crim. App. 2003) (explaining that
a defendant does not "voluntarily release[] the victim in a safe place" in the context of
Section 20.04(d) if the victim is rescued or escapes).
76. See cf. State v. Colyandro, 233 S.W.3d 870, 887-96 (Tex. Crim. App. 2007)
(Cochran, J., dissenting).
77. Tex. Penal Code Ann. § 1.07(a)(8) (Vernon 2003).
78. Lane v. State, 763 S.W.2d 785, 786 (Tex. Crim. App. 1989). 
79. Lewis v. State, 530 S.W.2d 117, 118 (Tex. Crim. App. 1975).
80. Rodriguez v. State, 646 S.W.2d 524, 527 (Tex. App.-Houston [1st Dist.] 2002,
no pet.).
81. Tex. Const. art. V, § 6.
82. Lancon, 253 S.W.3d at 704.
83. See Johnson, 23 S.W.3d at 11.